**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JIMMY R. NICKS and JAMES EARL PATRICK, individually and on behalf of all persons similarly situated, | ) ) ) ) | |
|     Plaintiffs, | ) ) | |
|     v. | ) ) | No. 16-cv-6446 |
| KOCH MEAT CO., INC., d/b/a KOCH FOODS, KOCH FOODS OF MISSISSIPPI, LLC, and JET POULTRY SERVICES, INC., | ) ) ) ) | |
|     Defendants. | ) ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

AMY J. ST. EVE, District Court Judge:

On December 22, 2016, Plaintiffs Jimmy R. Nicks ("Nicks") and James Earl Patrick ("Patrick"), individually and on behalf of all persons similarly situated, filed an Amended Collective Class Action Complaint against Defendants Koch Foods, Inc. ("Koch Foods"), Koch Meat Co., Inc. d/b/a Koch Poultry Co. ("Koch Meat"), Koch Foods of Mississippi ("Koch Foods MS"), JET Poultry Services, Inc. ("JET"), and several other Koch subsidiaries operating in Georgia, Alabama, and Tennessee ("AL-TN-GA Koch Defendants"), collectively "Defendants," seeking relief under the Fair Labor Standards Act of 1938, 29 U.S.C. § 201, *et seq*. ("FLSA"). (R. 99.) Koch Foods, Koch Meat, Koch Foods MS, and AL-TN-GA Koch Defendants (collectively, the "Koch Defendants") moved to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(3) for improper venue, or in the alternative, requested a transfer to the Southern District of Mississippi pursuant to 28 U.S.C. §§ 1404 or 1406. If the Court does not grant dismissal for improper venue and also does not transfer this case, AL-TN-GA Koch

Defendants alternatively moved to dismiss the Complaint pursuant to Rule 12(b)(6) for failure to state a claim, and all the Koch Defendants moved to dismiss all claims related to activities in Alabama, Tennessee, and Georgia for lack of standing under Rule 12(b)(1).

The Court now considers the Koch Defendants' motion. (R. 110.) For the following reasons, the Court denies the Koch Defendants' motion in its entirety.

## PROCEDURAL HISTORY

Plaintiffs initially filed a collective action against Defendants on June 21, 2016 on behalf of all individuals employed by Defendants as members of live-haul, chicken catching crews in the United States. (R. 1, Compl. ¶ 14.) JET filed a motion to dismiss on August 3, 2016, and Koch Foods MS filed a motion to dismiss on August 4, 2016. Both motions claimed the Court should dismiss this case for lack of personal jurisdiction and alternatively, for improper venue. On October 27, 2016, the Court denied Koch Foods MS's motion to dismiss without prejudice and granted Plaintiffs permission to conduct limited jurisdictional discovery related to the Koch Defendants' corporate structure, operations, and internal governance structure. (R. 82, Mem. Op. and Order 4.) The Court reserved opinion on the Koch Defendants' venue challenge under 28 U.S.C. 1391(b)(1) and granted limited venue discovery relating to (b)(2). (*Id*. 7.) In compliance with the Court's order, Plaintiffs ordered discovery on the Koch Defendants and conducted relevant depositions.

On December 19, 2016, Plaintiffs and JET entered into a settlement agreement. (R. 101, Ex. 1, Settlement Agreement with JET.) As part of the settlement, JET agreed that the Court would retain jurisdiction with respect to the enforcement of the settlement terms and that JET would "submit to the jurisdiction of the Court for purposes of interpreting, implementing, and

enforcing the settlement." (*Id.* ¶ 14.)  On January 11, 2017, the Court approved the settlement and dismissed the claims against JET with prejudice.  (R. 105.)

Based on the limited jurisdictional and venue discovery, Plaintiffs filed the First Amended Complaint, in which Plaintiffs added certain Koch Defendants and modified their allegations.  (R. 9, Am. Compl.)  The Koch Defendants subsequently filed the present motion to dismiss, or alternatively transfer.

## **BACKGROUND**

Plaintiffs Nicks and Patrick are Mississippi residents who were "previously employed to catch and cage Koch's chickens as member[s] of a live-haul chicken catching crew[.]" (Am. Compl. ¶¶ 10-11.)  Plaintiffs worked for the Koch Defendants,[1] who Plaintiffs allege operate "one of the largest vertically integrated poultry processors in the United States." (*Id.* ¶ 12.) According to Plaintiffs, Koch Foods has a policy and practice of failing to pay overtime premiums and minimum wage to the individuals, like Plaintiffs, who catch chickens at Koch's subsidiary farms in Mississippi, Alabama, Georgia, and Tennessee.  (*Id.* ¶ 2.)

## I.    **Koch Corporate Structure**

Plaintiffs allege that although the Koch Defendants have organized themselves as several separately registered companies, these companies are unified in interest and ownership.  (*Id.* ¶ 14.)  Koch Foods is registered as a Delaware corporation, headquartered in Park Ridge, Illinois. (*Id.* ¶ 27.)  Koch Foods is the "fictional parent company" of the Koch LLC subsidiaries, including Koch Meat and the eight separate divisions, each of which is referred to as a "Complex," that handle live growing and processing of chickens for Koch in Mississippi,

---

[1] Throughout the Complaint, Plaintiffs refer to "the Koch-related defendants . . . as the "Koch Defendants," and "Koch Foods" [is] used to refer to the sum of each of the entities, which are all doing business in service of Koch Foods."  Plaintiffs refer to each of the Koch Defendants that form a Complex as the "_____ Complex" and collectively as the "Koch Complex Defendants." (*Id.* ¶ 1 n. 1).

Alabama, Georgia, and Tennessee.  (*Id.* ¶¶ 15, 27.)  Koch Meat was the original Koch entity that preceded the creation of Koch Foods, and it was created by current Koch Foods CEO, Joseph Grendys, in 1999.  (*Id.* ¶ 28.)  Koch Meat directly pays the officers, directors, and other employees of Koch Foods, as well as the managers of the eight Complexes.  (*Id.*)

The eight Koch Complexes are each registered as limited liability companies ("LLCs") in the state in which they are located, with facilities in-state, but with a corporate headquarters in Park Ridge, Illinois.  (*Id.* ¶¶ 29-50.)  Koch Foods Mississippi ("Koch Foods MS") and Koch Farms Mississippi ("Koch Farms MS)"), for example, are registered in Mississippi and have facilities in Morton, Mississippi, but they are headquartered in Park Ridge, Illinois.  (*Id.* ¶ 14.)[2] The Complexes are organized into an Eastern and Western Region, and each Region has a Vice President ("VP") who reports directly to the President and the Chief Operating Officer of Koch Foods, both of whom are located at Koch's Corporate Headquarters in Illinois. (*Id.*)  Plaintiffs allege that the finances of each Complex are "consolidated with the ultimate goal of increasing the profitability of the entity at a whole."  (*Id.* ¶ 16.)  Plaintiffs note that Koch Foods' website states that it has 13,000 employees nationwide with 40 employees at its Illinois headquarters. (*Id.* ¶ 17.)  Plaintiffs allege that Koch Foods has created a "fictitious corporate structure" at each Complex with a "Foods" entity that processes the chickens and a "Farms" entity that grows the chickens, although the entities have the same management and reporting structure.  (*Id.* ¶ 18.) The Foods entities pay all employees at a given Complex, regardless of whether the employee works in the grow-out operation or the chicken processing operation.  (*Id.*)  The Foods entities also maintain lock box accounts at Harris Bank in Illinois and receive payments from outside vendors to a post office box in Illinois.  (*Id.* ¶¶ 53, 81.)

---

[2] There are also Koch Complexes in Alabama (Montgomery, Gadsden, Collinsville, and Ashland), Tennessee (Chattanooga and Morristown), and Georgia (Pine Mountain Valley).  (*Id.* ¶¶ 32-49.)

Plaintiffs allege that the Koch Defendants fail to observe corporate formalities or maintain an arm's-length-relationship between each other. (*Id.* ¶ 19.) Plaintiffs claim, for example, that Koch Foods and Koch Meat do not maintain corporate minutes or a corporate records book, all the Koch Defendants share the same logo, and all employees of the Koch Defendant entities share the same email domain. (*Id.* ¶¶ 19-22.) Additionally, the various Koch corporate entities share products and funds between themselves. (*Id.* ¶ 23.) These transactions are recorded as "inter-company transfers" on a consolidated Cash Sheet maintained at the Koch corporate headquarters in Illinois, the same Koch Foods officers represent both sides in the transactions, and no money is exchanged. (*Id.*) Plaintiffs claim that the Koch Defendants comingle their funds, and Koch Foods loans money, with no written agreement, to a subsidiary whenever necessary. (*Id.* ¶ 25.)

The Koch Defendants also share common officers and directors. (*Id.* ¶ 26.) Joseph Grendys ("Grendys") and Mark Kaminsky ("Kaminsky"), both of whom work out of the Illinois headquarters, are respectively CEO and COO of Koch Foods and they are also listed as officers and directors of each of the separately registered Koch entities that form the eight Complexes. (*Id.*) Grendys is the ultimate decision maker for each Koch entity. (*Id*. ¶ 72.) Plaintiffs allege that the Koch corporate entity that is geographically closest to a given employee is responsible for paying that employee, regardless of whether that employee works for that particular entity. (*Id*. ¶ 24.) The VP of the Eastern Region, for example, who is a Koch Foods employee, works out of Mississippi, so Koch Foods of Mississippi pays him, even though the Mississippi Complex reports to the Western Region and the Eastern Region VP has no job responsibilities relating to the Mississippi Complex. (*Id.*)

Each Complex has a Complex Manager, who oversees the live production and processing operations at that Complex. (*Id.* ¶ 73.) The Complex Managers report to the corresponding Eastern or Western Region VPs, who are responsible for managing the Complexes' operations, including reducing the Complexes' labor costs when possible. (*Id.* ¶¶ 73-74.) The Region VPs are Koch Foods employees who oversee multiple Koch subsidiaries, but as noted above, they are not necessarily paid out of the budget of the subsidiaries they manage. (*Id.* ¶ 74.) Plaintiffs allege that the Complex employees must abide by the directives of the Region VPs. (*Id.* ¶ 75.) For example, Koch Foods holds weekly conference calls, led by Koch Foods Cost Controller, Wayne Brantley, in which each Complex provides operational reports to the COO and the Region VPs. (*Id.*) Each Complex also has a Controller, who is responsible for maintaining the books and records for the Complex and reporting the financial results to Koch Foods CFO Lance Buckert ("Buckert") at the end of every month. (*Id.* ¶ 76.) Buckert has the authority to hire and fire Controllers at each Koch subsidiary. (*Id.*) The Koch Defendants also share key managerial employees, such as Cost Controller, Director of Purchasing, and Senior Director Quality Assurance. (*Id.* ¶ 77.) The Director of Purchasing, for example, is a Koch Foods employee who purchases equipment for all the Koch entities. (*Id.*) The Koch Defendants also share a Safety Director, who instructs all the subsidiaries on running safe operations. (*Id.* ¶ 80.) Grendys is the sole manager of all the LLC subsidiaries, and Kaminsky approves the budget for each entity. (*Id.* ¶ 86.) Koch Meet pays both Kaminsky and Grendys. (*Id.*)

According to Plaintiffs, Koch Foods does not independently make a profit and only profits from the money made by the subsidiary Koch Complexes. (*Id.* ¶ 78.) The Complexes' budgets, which Kaminsky must approve, are incorporated into the costs and budget of Koch Foods. (*Id.* ¶ 79.) To qualify for its line of credit, Koch Foods had to provide information about

the financial standing of the Koch Complexes, all of which make profits for and borrow money from Koch Foods. (*Id.* ¶¶ 82-83.) Koch Foods' Consolidation Manager, who is based in Illinois, manages the daily transfers of funds between the various Koch entities on an accounting platform provided by Harris Bank. (*Id.* ¶ 84.) This platform contains checking and operating accounts for every Koch entity. (*Id.*) To effectuate a transfer, the Consolidation Manager determines which entities need additional funds and then the CFO, Buckert, approves the transfer. (*Id.*) Koch Foods generates a daily "Cash Sheet" that informs each subsidiary what funds Koch Foods has transferred in or out of its accounts. (*Id.*)

## II.    Koch Operations Generally

Koch Foods produces poultry products for human consumption worldwide and thus requires large quantities of chickens for its processing operations. (*Id.* ¶ 63.) Koch Foods hatches chicken in Koch-owned hatcheries and ships them to poultry growers. (*Id.* ¶ 65.) The poultry growers only house Koch-owned chickens, and Koch Foods retains ownership of the chickens and controls the way they are raised. (*Id.* ¶¶ 65-66.) Koch Foods employs a veterinarian and a nutritionist, each of whom the Koch Foods local subsidiary pays, at each Complex to set the feed profiles for the chickens. (*Id.* ¶ 67.) Koch chickens are all raised "cage free," and Koch Foods only retrieves the chickens for processing once they reach a marketable age and size. (*Id.* ¶ 69.)

The Koch Complex Defendants and Koch Meat often buy and sell chicken from and to each other. (*Id.* ¶ 70.) Koch Meat and Koch Foods MS, for example, buy and sell chicken breasts from each other and ship the chicken breasts from Koch Meat's facilities in Illinois to Koch Foods MS's facilities in Mississippi and vice versa. (*Id.*) Grendys, the CEO of Koch Foods, determines the sale price of the chickens and both parties are represented in these

transactions by Buckert, the Koch Foods CFO based in Illinois. (*Id.*) These transactions involve no transfer of funds and payment is reflected only through changes in each entity's ledger balances. (*Id.*) Koch Meat utilizes similar transactions to buy chicken from Complexes in Gadsden, Collinsville, Montgomery, and Ashland. (*Id.* ¶ 71.)

## III.     Koch Chicken Catching Operations

Plaintiffs allege that Koch Foods, through each of the Koch Complexes, employs crews of chicken catchers like Plaintiffs who operate in substantially the same manner, regardless of the Complex at which they work. (*Id.* ¶¶ 87, 90.) According to Plaintiffs, the live-haul catching crews are critical to the Koch Defendants' chicken processing business and allow it to produce large-scale poultry products for interstate distribution. (*Id.* ¶ 88.) Each live-haul crew consists of eight to twelve chicken catchers, one or two forklift operators, and a crew leader. (*Id.* ¶ 89.) Plaintiffs allege that prior to 2012, the Koch Defendants used a combination of direct employee chicken catching crews and crews provided by third party staffing companies, but the services provided by both types of crews was identical. (*Id.* ¶¶ 92-93.) In the 2012 to 2013 time period, the Koch Defendants began exclusively using third party contractors to staff its live-haul crews because they were having difficulty maintaining a labor force to serve on the chicken catching crews. (*Id.* ¶¶ 55, 94.) Koch Foods COO Mark Kaminsky and the Region VPs approved this decision. (*Id.* ¶ 95.) Plaintiffs claim that Koch Foods, through the subsidiary Complexes, pays the third party contractors, including JET,[3] based on the number of chickens caught, and the third party contractors in turn pay the members of the chicken catching crews. (*Id.* ¶¶ 56, 100-02.)

---

[3] JET is a Mississippi corporation headquartered in Summit, Mississippi. (*Id.* ¶ 57.) JET submits weekly invoices to the Koch subsidiary at each Complex it services, and then Koch Farms of Mississippi issues payments to JET from its bank account in Illinois. (*Id.* ¶ 58.) As noted above, the Court approved a settlement agreement between JET and Plaintiffs on January 11, 2017, after Plaintiffs filed this Amended Complaint. (R. 104, Order Approving Settlement.)

Plaintiffs further allege that Koch Foods does not pay the third party contractors enough for them to pay their employees minimum wage and overtime pay and still operate profitably. (*Id.* ¶ 103.)

In addition, Plaintiffs allege that although the Koch Defendants use third party staffing companies for their live-haul crews, they are in fact joint employers of Plaintiffs and other members of the crews. (*Id.* ¶ 104.) Plaintiffs claim that the Koch Defendants maintain operational control over the day-to-day functions of Plaintiffs and every aspect of the chicken catching operation. (*Id.* ¶¶ 105, 108.) Plaintiffs travel to Koch Foods' farms to capture the chickens and they place them in Koch cages for transport to Koch Foods' processing plants at each of the Koch Complexes. (*Id.* ¶ 106.) Plaintiffs allege that JET and the other third party staffing companies merely provide the "human labor," but the equipment and materials they use, as well as the chickens they catch, belong to Koch. (*Id.* ¶¶ 109-10.) The staffing companies transport the crew members from their homes to the Koch farms, and after the shift is complete, the companies drop off the crew members at their homes. (*Id.* ¶ 113.) The pick-up and drop-off process can take up to two hours each way, and the Koch Defendants set the work locations and shift durations. (*Id.*)

According to Plaintiffs, the Koch Defendants also largely control the rate and method of payment to Plaintiffs by paying the staffing companies on a piece rate basis with such thin margins that it is impossible for the companies to pay overtime and minimum wage. (*Id.* ¶ 114.) The Koch Defendants maintain the chicken catching records upon which they base their payments to the staffing companies, and the Koch Defendants determine the work schedules and conditions of Plaintiffs' employment. (*Id.* ¶¶ 115-16.) The Live Haul Operations Manager at each Complex supervises the work of the live-haul crews and dictates their daily schedules and working conditions. (*Id.* ¶ 117.) Koch employees also set the growing and catching

requirements as directed by Koch Foods in Illinois.  (*Id.* ¶ 118.)  Specifically, Koch Foods dictates the times at which chickens are put in cages and how many chickens are put in cages based on specific factors related to Koch Foods' processing plants that Koch Foods' employees monitor.  (*Id.* ¶¶ 119-20.)  The Koch Complexes also employ an internal auditor and an independent auditor who visit the work site to ensure that the live-haul crews are adhering to Koch's directives and if there are any aberrations, the Quality Control department at Koch Foods or the Koch Complex notifies the staffing companies that the crews must follow Koch's directives.  (*Id.* ¶¶ 122-23.)  The Koch Complexes also employ Live Haul Supervisors on-site who oversee the catching practices and ensure that the live-haul crews are following Koch's directives.  (*Id.* ¶ 124.)  Both the Koch Defendants and the third party staffing companies retain the right to hire and terminate live-haul crew members.  (*Id.* ¶ 125.)

Plaintiffs allege that regardless of the Complex or state, the live-haul crews' work is uniform.  (*Id.* ¶ 126.)   On a typical work day, vans pick up the crews at their respective homes on a route that Koch Foods and the Koch Complexes determine based on the availability of Koch's processing plans.  (*Id.*)  The vans take the crew members several miles away from their homes to farms where they spend the day catching chickens.  (*Id.*)  Their work requires no specialized training, is unskilled, repetitive work, and does not involve raising poultry.  (*Id.* ¶¶ 127-28.)  Live-haul crews typically work ten to twelve hours per day, five to six days per week, catching tens of thousands of chickens each day.  (*Id.* ¶¶ 129-30.)  Once they place the chickens in the cages, the crew forklift operator moves the cages onto trucks owned by the Koch Defendants for transport to the processing plant at a Koch Complex.  (*Id.* ¶ 131.)  The Koch Defendants own the forklifts and cages used by the crews and they also own the chickens, the chicken feed, and the trucks used to distribute the chicken feed.  (*Id.* ¶¶ 132-33.)

## IV.    Pay-Related Allegations

Plaintiffs allege that all crew members are non-exempt employees paid on a piece-rate basis per 1,000 chickens caught.  (*Id.* ¶ 134.)  According to Plaintiffs, Defendants require crew members to work hours in excess of 40 hours per week, but do not pay them overtime or compensate them for travel time or time spent waiting for the Koch Defendants' machines to become available.  (*Id.* ¶¶ 136-37.)  Plaintiffs contend that Defendants do not properly record the number of hours worked by crew members, and accordingly, do not pay crew members minimum wage or pay them overtime premium for hours worked over 40 hours per work.  (*Id.* ¶¶ 138-40.)

Plaintiffs allege that Defendants have long been on notice that they must pay live-haul crews overtime due to Supreme Court decisions and Department of Labor inquiries.  (*Id.* ¶¶ 142-44.)  According to Plaintiffs, the Department of Labor investigated the payment policies of live-haul crews at the Koch Mississippi Complex prior to this lawsuit, but Defendants did not take any action to ensure that they were properly paying the live-haul crews.  (*Id.* ¶ 144.)  The Koch Defendants have not advised the third party staffing companies that they are obligated to pay overtime and minimum wage, and in fact, the Koch Defendants' negotiated prices do not account for minimum wage or overtime costs.  (*Id.* ¶¶ 145-46.)  As a result, Plaintiffs allege that Defendants have violated the FLSA provisions relating to minimum wage and overtime pay.  (*Id.* ¶¶ 167, 182.)

## LEGAL STANDARD

## I.    12(b)(1)

Article III of the Constitution limits federal judicial power to certain "cases" and "controversies," and the "irreducible constitutional minimum" of standing contains three

elements. *Lujan v. Defs. of Wildlife,* 504 U.S. 555, 559–60 (1992) (internal citations and quotations marks omitted). "To establish Article III standing, 'a plaintiff must show (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.'" *Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015) (citations and quotations omitted); *see also Berger v. Nat'l Collegiate Athletic Ass'n*, 843 F.3d 285, 289 (7th Cir. 2016). The "[p]laintiff bears the burden of establishing the elements of Article III standing." *Id.* (citing *Lujan*, 504 U.S. at 561). A facial challenge to subject matter jurisdiction contends that the plaintiffs' complaint lacks sufficient factual allegations to establish standing. *Silha*, 807 F.3d at 173. "In reviewing a facial challenge, the court must accept all well-pleaded factual allegations as true and draw all reasonable inferences in favor of the plaintiff." *Id.*

## II.      12(b)(3)

Under Rule 12(b)(3), a party may move for dismissal of an action that is filed in an improper venue. *See* Fed. R. Civ. P. 12(b)(3). Once a defendant challenges the plaintiff's choice of venue, the plaintiff bears the burden of establishing that it filed its case in the proper district. *See Gilman Opco LLC v. Lanman Oil Co.*, No. 13-CV-7846, 2014 WL 1284499, at *2 (N.D. Ill. Mar. 28, 2014). Under Rule 12(b)(3), "the district court assumes the truth of the allegations in the plaintiff's complaint, *unless* contradicted by the defendant's affidavits." *Deb v. SIRVA, Inc.*, No. 14-2484, 2016 WL 4245497, at *5 (7th Cir. Aug. 11, 2016) (emphasis in original); *see also Faulkenberg v. CB Tax Franchise Sys., LP*, 637 F.3d 801, 809-10 (7th Cir. 2011) (courts may consider matters outside of the pleadings in deciding a venue motion). Against a Rule 12(b)(3) challenge, the court must resolve any factual disputes and draw all reasonable inferences in the

plaintiff's favor. *See Gilman*, 2014 WL 1284499 at *2. When venue is improper, the Court "shall dismiss [the case], or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought." *See* 28 U.S.C. § 1406(a).

## III.    12(b)(6)

A Rule 12(b)(6) motion challenges the sufficiency of the complaint itself. *Bell v. City of Country Club Hills*, 841 F.3d 713, 716 (7th Cir. 2016). Under Rule 8(a)(2), a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The short and plain statement under Rule 8(a)(2) must "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atlantic v. Twombly,* 550 U.S. 544, 555 (2007) (citation omitted). Under the federal notice pleading standards, a plaintiff's "factual allegations must be enough to raise a right to relief above the speculative level." *Twombly,* 550 U.S. at 555. Put differently, a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly,* 550 U.S. at 570). In determining the sufficiency of a complaint under the plausibility standard, courts must "accept all well-pleaded facts as true and draw reasonable inferences in the plaintiffs' favor." *Roberts v. City of Chicago*, 817 F.3d 561, 564 (7th Cir. 2016). In ruling on a Rule 12(b)(6) motion, district courts may also consider documents attached to the pleadings without converting the motion into a motion for summary judgment, as long as the documents are referred to in the complaint and central to the claims. *See Geinosky v. City of Chicago,* 675 F.3d 743, 745 n. 1 (7th Cir. 2012).

## ANALYSIS

## I.    Venue

The Court first considers the Koch Defendants' venue challenge under Rule 12(b)(3). Plaintiffs argue that venue is proper in the Northern District of Illinois under 28 U.S.C. §

1391(b)(1), (b)(2), and (b)(3).[4]  Section 1391(b)(2) provides that "a civil action may be brought in a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred[.]"  As the Court has previously recognized, the test "is not whether a majority of the activities pertaining to the case were performed in a particular district, but whether a substantial portion of the activities giving rise to the claim occurred in a particular district."  *Allstate Life Ins. Co. v. Stanley W. Burns, Inc.*, 80 F. Supp. 3d 870, 877 (N.D. Ill. 2015).

According to Plaintiffs, venue discovery has revealed that a "substantial portion" of the activities giving rise to their FLSA claim occurred in the Northern District of Illinois, where Koch Foods operated and organized its "scheme to control its labor force in a uniform manner necessary to implement its vertically integrated poultry processing systems."  (R. 116, Pls. Resp. to Defs. Mot. to Dismiss 25.)  The Koch Defendants, on the other hand, argue that Plaintiffs' Amended Complaint is "devoid of factual allegations showing that a substantial part of the events . . . giving rise to the claim occurred in Illinois" because this case involves live-haul chicken catching crews working on farms located outside in Illinois and being paid by entities located outside of Illinois.  (R. 110, Defs. Mot. to Dismiss 8.)

Venue may be proper in more than one court.  *See Armstrong v. LaSalle Bank Nat. Ass'n*, 552 F.3d 613, 617 (7th Cir. 2009).  While a district court in Mississippi, or another state in which the Koch Complexes are located and where live-haul crews work, may very well be a proper venue under 28 U.S.C. § 1391(b)(2), Plaintiffs' allegations indicate, despite the Koch Defendants' arguments, that Illinois was also a situs of a "substantial portion of the activities giving rise" to their FLSA claim.  In the Amended Complaint, Plaintiffs allege a corporate structure in which each of the eight Koch Complexes report directly to the Region VPs who

---

[4] Because the Court has determined that venue is proper under § 1391(b)(2), it need not address the parties' arguments regarding the other venue provisions.

report to the COO, Mark Kaminsky, who is based in Illinois.  (Am. Compl. ¶¶ 14, 72-74.)

Indeed, Koch Foods' CEO, Joseph Grendys, who also is based in Illinois, is the manager and

ultimate decision-maker for all the Koch Complexes at which live-haul crew members worked

and Grendys and Kaminsky are listed as officers and directors of all the Koch entities.  (*Id.* ¶¶

26, 72.)  Kaminsky and other Koch Foods' executives—all of whom work out of corporate

headquarters in Illinois—exercise operational control over the subsidiary Koch Complexes in

part through the aforementioned reporting structure, but also through weekly company-wide

conference calls led by Wayne Brantley, Koch Foods Corporate Cost Controller, in which the

Complexes provide reports on their operating statistics to Kaminsky, Brantley, and the Region

VPs.  (*Id.* ¶ 75.)  The Complexes also have Controllers who provide financial reports for each

fiscal period to Koch Foods CFO, Lance Burkett, who also is based at the Illinois headquarters.

(*Id.* ¶ 76.)

Importantly, in addition to a centralized reporting and management structure

headquartered in Illinois, according to Plaintiffs' Amended Complaint, Koch employees also

control and manage the specific payments made to the third party staffing companies responsible

for hiring and paying Plaintiffs.  (*Id.* ¶ 53.)  All the Koch Complex Defendants have a clearing

account at Harris Bank in Illinois and Grendys and Kaminsky are the authorized signers on those

accounts.  They use these accounts to pay the third party staffing companies.  (*Id.*)  These

accounts also hold the Koch Complexes' funds, and Koch Foods employees in Illinois use the

funds in these accounts to transfer money between the Koch Complexes and between the

Complexes and Koch Foods itself.  (*Id.* ¶¶ 53, 79, 81, 84.)  As a result of this financial structure,

the Koch employees in Illinois have operational and decision-making authority to initiate

payments to the third party staffing companies that ultimately pay the live-haul crew members.

Plaintiffs also allege that the Koch Defendants discussed the decision to use third party staffing companies to hire and pay the live-haul crews at a company-wide level, and that Koch Foods approved the decision to use these companies.[5]  (*Id.* ¶¶ 94-96.)  Further, Plaintiffs allege that Koch Foods employees in Illinois directed the Complexes as to how to run their live-haul operations, including deciding how many chickens the live-haul crews need to collect and put in cages each day and to which farms the live-haul crews will travel in order to catch chickens.  (*Id.* ¶¶ 80, 119.)  Koch Foods employees in Illinois make these decisions in accordance with Koch's corporate specifications for chicken processing, and according to Plaintiffs, these decisions directly impact the working conditions for the live-haul crews.  (*Id.* ¶¶ 119-20.)

In sum, Plaintiffs' allegations raise a reasonable inference that a "substantial portion of the activities giving rise to the claim occurred" in Illinois.  *Allstate Life Ins.*, 80 F. Supp. 3d at 877.  Specifically, viewing the Amended Complaint "liberally, in its entirety, and with every inference drawn in favor" of Plaintiffs, *see Phencorp*, 440 F.3d at 877-78, these allegations make clear that Koch Foods employees in Illinois decided to use third party staffing companies and decided what to pay those companies, and they raise the inference that Koch Foods sets the relevant wage and employment policies at the Koch Complexes.  Accordingly, venue is proper in the Northern District of Illinois under § 1391(b)(2).

## II.     Motion to Transfer Venue

"In 1948, Congress enacted the federal change of venue statute, codified at 28 U.S.C. § 1404, to allow a district court to transfer an action filed in a proper, though not necessarily convenient, venue to a more convenient district."  *Research Automation, Inc. v. Schrader-*

---

[5] The Koch Defendants dispute the allegation that there was a company-wide decision to use third party staffing companies.  (Defs.' Reply 2.)  As the Koch Defendants admit in their brief, however, in considering a Motion to Dismiss for improper venue, the Court "assumes the truth of the allegations in the plaintiff's complaint."  *Deb*, WL 4245497, at *5.

*Bridgeport Int'l Inc.*, 626 F.3d 973, 977 (7th Cir. 2010). More specifically, "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). Under Section 1404(a), the moving party bears the burden of establishing that (1) venue is proper in the transferor district, (2) venue and jurisdiction would be proper in the transferee district, and (3) the transfer will serve the convenience of the parties and witnesses and is in the interest of justice. *See Coffey v. Van Dorn Iron Works*, 796 F.2d 217, 219-20 (7th Cir. 1986). "The weighing of factors for and against transfer necessarily involves a large degree of subtlety and latitude, and, therefore, is committed to the sound discretion of the trial judge." *Id.* at 219.

As discussed above, venue is proper in both the Northern District of Illinois and the Southern District of Mississippi. While a substantial part of the events giving rise to Plaintiffs' claim occurred in Illinois, a substantial part of the events giving rise to Plaintiffs' claim *also* occurred in Mississippi because the live-haul crews worked in Mississippi and were paid in Mississippi, so venue would be proper in Mississippi as well as Illinois. Although Plaintiffs argue that jurisdiction in the Southern District of Mississippi would not be proper over the all the Koch Defendant entities, all the Koch Defendants have stipulated that they will consent to personal jurisdiction in the Southern District of Mississippi if this case is transferred to that district. (R. 125, Defs. Reply Mem. in Supp. of Mot. to Dismiss 14.) *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473 n. 14 (1985) (noting that a litigant may consent to personal jurisdiction). Therefore, the Court turns to whether transfer will serve the convenience of the parties and witnesses and promote the interests of justice. In making this determination, the Court looks to both the private and public interests. *See Research Automation*, 626 F.3d at 978;

*Nalco Co v. Envtl. Mgmt., Inc.*, 694 F. Supp. 2d 994, 998 (N.D. Ill. 2010). Private interests include: (1) the plaintiff's choice of forum; (2) the situs of the material events; (3) the relative ease of access to sources of proof; and (4) the convenience to the witnesses and parties. *See Research Automation*, 626 F.3d at 978; *Nalco*, 694 F. Supp. 2d at 998. Factors traditionally considered in the public interest analysis, also known as the "interest of justice" factors, include the congestions of the respective court dockets, prospects for a speedy trial, and the courts' familiarity with the applicable law. *See Research Automation*, 626 F.3d at 978. District courts may make any necessary factual findings when determining venue issues. *See In re LimitNone, LLC*, 551 F.3d 572, 577 (7th Cir. 2008).

### A. Public Interest Factors

#### 1. Plaintiffs' Choice of Forum

Traditionally, the plaintiff's choice of forum is a factor that weighs in favor of the plaintiff in evaluating a motion for transfer of venue. In *Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 255 (1981), the Supreme Court noted that "there is ordinarily a strong presumption in favor of the plaintiff's choice of forum, which may be overcome only when the private and public interest factors clearly point towards trial in the alternative forum." *See also In re Nat'l Presto Indus., Inc.,* 347 F.3d 662, 663–64 (7th Cir. 2003) ("unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed"). That deference is lessened, however, when "the plaintiff's chosen forum is not the plaintiff's home forum or has relatively weak connections with the operative facts giving rise to the litigation." *Body Sci. LLC v. Boston Sci. Corp.*, 846 F. Supp. 2d 980, 992 (N.D. Ill. 2012).

Here, the Koch Defendants, argue that the Court should give Plaintiffs' choice of forum—this District—little weight because all material events took place in other states and

because Plaintiffs reside in other states. While Plaintiffs' choice of forum deserves less deference because this District is not their home forum, their choice of forum is still entitled to some deference because, contrary to the Koch Defendants' argument, this District has a strong connection to the operative facts giving rise to this litigation. As discussed at length above, Plaintiffs allege that the Koch Defendants utilized a centralized reporting and management structure based in Koch's Illinois headquarters. (Am. Compl. ¶ 53.) Employees at Koch's Illinois headquarters exercise significant operational and financial control over the Koch Complexes that employed Plaintiffs and their live-haul operations, and Plaintiffs allege that Illinois employees discussed and approved the decision to use third party staffing companies. (*Id.* ¶¶ 80, 94-96, 119-20.) Finally, the Koch Complex Defendants all have accounts at Harris Bank in Illinois and the Koch Defendants used funds from these accounts to pay the third party staffing companies and in turn Plaintiffs. (*Id.* ¶¶ 53, 79, 81, 84.) In short, this District has a strong and substantial connection to the key facts in this case.

Additionally, several courts have observed that the FLSA provides an "opt-in" procedure under 29 U.S.C. § 216(b) and have accordingly concluded that "Congress intended to give plaintiffs considerable control over the bringing of an FLSA action." *Alix v. Shoney's, Inc.,* No. 96–2812, 1997 WL 66771 *3 (E.D. La. Feb. 18, 1997); *see also McKee v. PetSmart, Inc.*, No. CA 12-1117-SLR-MPT, 2013 WL 1163770, at *3 (D. Del. Mar. 20, 2013), *report and recommendation adopted*, WL 2456719 (D. Del. June 5, 2013) (noting "that the 'opt-in' structure of collective actions under section 216(b) of the FLSA strongly suggests that Congress intended to give plaintiffs considerable control over the bringing of a FLSA action."); *Onyeneho v. Allstate Ins. Co.,* 466 F. Supp. 2d 1, 5 n. 2 (D.D.C. 2006) (stating that "collective actions under the FLSA require prospective plaintiffs to affirmatively opt-in to the action, unlike class actions

under Federal Rule of Civil Procedure 23, in which plaintiffs are included unless they opt-out");

*Guerrero v. Habla Communications,* No. H–05–3620, 2006 WL 696646 *2 (S.D. Tex. Mar. 16, 2006) (observing that "[i]f such a plaintiff decides that it would be too inconvenient to opt-in here, he or she can file suit closer to home. A plaintiff who does choose to opt-in here would presumably be signaling his judgment that the relative inconvenience was not particularly significant.").

Accordingly, considering this District's connection to the operative facts and the traditional FLSA deference to the plaintiff's choice of forum, this factor weighs in Plaintiffs' favor, but with slightly less force than if Plaintiffs resided in this District.

## 2. Situs of Material Events

The Koch Defendants argue that the situs of the material events in this case is Mississippi because the named Plaintiffs worked in Mississippi and were compensated in Mississippi. Courts recognize that, in FLSA cases challenging a corporate defendant's overtime and pay policies, the corporation's headquarters is often the situs of many of the material events, even if the employees work elsewhere. In *Earley v. BJ's Wholesale Club, Inc.*, No. 06 CIV. 3529 (WHP), 2007 WL 1624757, at *1 (S.D.N.Y. June 4, 2007), for example, the plaintiff brought an FLSA action challenging the defendant's overtime policies, and the court ruled that the situs of operative facts was at defendant's headquarters in Massachusetts. The court noted that it was "likely that Defendant's national overtime policies were determined at its headquarters" and found that "many of the documents and executives relevant to discovery are located [there]." *Id.* at *2; *see also See Martignago v. Merrill Lynch & Co.*, No. 11 CIV. 3923 PGG, 2012 WL 112246, at *7 (S.D.N.Y. Jan. 12, 2012) (finding that this factor weighed in favor of plaintiff's

choice of forum because FLSA defendant's headquarters were the primary site of events from which the claim arose).

Some of the material events in this case certainly took place in Mississippi, however, Plaintiffs' Amended Complaint establishes that the alleged FLSA violations stem from corporate policies and decisions made within this District by employees who reside in this District. While the Koch Complexes are located throughout the South, the Koch employees who exercise operational and financial control over those Complexes reside in Illinois and work at Koch's headquarters here. Additionally, as Plaintiffs note, the potential class in this case will include crew members in Alabama, Georgia, and Tennessee as well as Mississippi, and thus, the location where potential plaintiffs worked and were paid will be as much in those states as in Mississippi. Accordingly, as in *Earley*, the decisions Koch employees made at Koch's corporate headquarters in Illinois are vital to this case, and thus, this factor also weighs against transfer.

### 3. Relative Ease of Access to Sources of Proof

The Koch Defendants argue that litigating this case in Mississippi would make it easier to access sources of proof because the named Plaintiffs reside in Mississippi, other witnesses are also located in Mississippi, and the business records relating to this case are located in Mississippi, Alabama, Georgia, and Tennessee. Plaintiffs respond that the Koch corporate witnesses and policies are all located at Koch's corporate headquarters in Illinois and note that the Koch Defendants can produce any documents not located in Illinois electronically.

As Plaintiffs note, courts now, given the technological advancements in document production, often consider the location of documentary evidence a neutral factor. *Cont'l Cas. Co. v. Staffing Concepts, Inc.,* No. 06 C 05473, 2009 WL 3055374, at *5 (N.D. Ill. Sept.18, 2009) ("[D]ocumentary evidence is readily transferable and transporting it generally does not

pose a high burden upon either party.") (citing *First Nat'l Bank v. El Camino Res., Ltd.,* 447 F.

Supp. 2d 902, 912 (N.D.Ill.2006). Here, there will likely be witnesses and documents located

both in Illinois at Koch's corporate headquarters and throughout the South at the various Koch

Complexes. Accordingly, this factor remains neutral.

### 4. Convenience to the Witnesses and Parties

"Convenience to the witnesses is the factor often viewed as having the most weight in

determining whether to transfer venue." *St. Paul Fire & Marine Ins. Co. v. Brother Int'l Corp.*,

No. 05 C 5484, 2006 WL 1543275, at *4 (N.D. Ill. June 1, 2006) (citations omitted). "When

evaluating this factor, the Court must examine 'the nature and quality' of each proposed

witness's testimony . . . [and] whether the witnesses are likely to appear voluntarily, whether

they will be subject to compulsory process, and whether they are experts, whose attendance is

controlled by the party who hired them." *Toriumi v. Ritz–Carlton Hotel Co., LLC,* No. 06 C

01720, 2006 WL 3095753, at *2 (N.D. Ill. Oct. 27, 2006) (citations omitted). "Vague

generalizations concerning potential witnesses are insufficient . . . [and] the party seeking

transfer on the grounds of witness convenience must clearly specify the key witnesses to be

called and include a generalized statement about what their testimony will include." *St. Paul

Fire*, WL 1543275, at *4. Additionally, "the convenience of employee witnesses is given less

weight than the convenience of non-party witnesses." *Rorah v. Petersen Health Care*, No. 13 C

01827, 2013 WL 3389063, at *4 (N.D. Ill. July 8, 2013).

Here, the Koch Defendants argue that the convenience of the witnesses favors transfer

because many of the witnesses will be opt-in plaintiffs and Koch and JET employees who reside

in Mississippi, Tennessee, Georgia, and Alabama. Plaintiffs respond that Mississippi would not

be more convenient than Illinois because the Koch Defendants and their counsel are located here,

many of the Koch executives and decision-makers are located here, and the opt-in plaintiffs and witnesses at Koch Complexes will be located throughout the South, not just in Mississippi. Plaintiffs note that the parties will be able to cooperate on the location of depositions, as they have done to date, to ensure that they are mutually convenient to both parties.

Courts have recognized that when a plaintiff asserts FLSA claims on behalf of a nationwide collective class that emanate from a corporate policy, much of the most important testimony will come from employees at the corporation's headquarters. In *Martignago v. Merrill Lynch & Co.*, No. 11 CIV. 3923 PGG, 2012 WL 112246, at *1 (S.D.N.Y. Jan. 12, 2012), for example, the plaintiffs alleged that the defendant, a large national bank, violated the FLSA by failing to pay overtime wages. The named plaintiffs worked in the bank's Texas, Washington, Florida, and New Jersey offices, but the bank's corporate headquarters were in New York. *Id.* The defendant bank sought to transfer the case to Texas, where the original named plaintiff resided, but the court rejected the motion to transfer in part based on the convenience to witnesses and parties factor. *Id.* at *6. The court explained that the most critical and extensive testimony relating to the plaintiff's claims regarding the bank's overtime compensation policy would likely come from witnesses residing "where the company is headquartered and where the executives who set company-wide policies are based." *Id.* (citations and quotations omitted); *see also Earley*, WL 1624757, at *2–*3 ("Plaintiff alleges a corporate policy of denying overtime pay to employees throughout the United States. . . it is likely that Defendant's national overtime policies were determined at its headquarters in Massachusetts. Moreover, it is undisputed that many of the documents and executives relevant to discovery are located in Massachusetts. . . Accordingly, this factor weighs in favor of transfer to Massachusetts."); *Waldmer v. SER Solutions, Inc.,* No. 05–cv–2098, 2006 WL 314346, at *5 (D. Kan. Feb. 3, 2006) ("Although

[defendant] regularly conducts business in Kansas, and a majority of the plaintiffs have done some work for [defendant] in Kansas . . . the logical origin of this dispute is Virginia. It was at the company's headquarters in Virginia that [defendant's] personnel made and implemented the decision to treat plaintiffs as exempt under the FLSA. No company policies were ever established in Kansas.").

Here, like in *Martignago*, *Earley*, and *Waldmer*, Koch likely maintains its corporate policies relating to payment of live-haul crew members and the staffing companies that hired them at Koch's corporate headquarters in Illinois. The Koch employees who made and implemented these policies and who exerted operational and financial control over the Koch Complexes where Plaintiffs worked are also largely located in Illinois. While some witnesses will certainly be located in the states in which the Koch Complexes operate, the "most material witnesses are likely to be those at company headquarters who were responsible" for creating Koch's policies and financially and operationally running the Complexes. *Martignago*, WL 112246, at *6. Further, any opt-in plaintiffs from states in the South "have indicated through the act of consenting to become party plaintiffs that they agree to the current venue of this action." *Paine v. Intrepid U.S.A., Inc.*, No. 3:14-2005, 2015 WL 3743357, at *7 (M.D. Tenn. June 15, 2015). Accordingly, this factor favors Plaintiffs.

### B. Private Interest Factors

As noted above, factors traditionally considered in the public interest analysis, also known as the "interest of justice" factors, include the congestions of the respective court dockets, prospects for a speedy trial, and the courts' familiarity with the applicable law. *See Research Automation*, 626 F.3d at 978. Here, the Koch Defendants argue that these factors favor transfer because the Southern District of Mississippi's docket is less congested than this District's docket

and because Illinois has no interest in regulating the chicken catching business in southern states. Plaintiffs argue that this Court is capable of efficiently moving this case towards trial and is already familiar with the issues in this case, thus transferring this case would cause unnecessary delay.

Both this Court and the Southern District of Mississippi are equally familiar with the FLSA, so this factor is neutral. While the Southern District of Mississippi's docket is less congested than the Northern District of Illinois's, this Court's specific docket is not congested, and any potential efficiencies achieved by transferring the case will be undermined by the delay caused by the transfer and the time it takes the transferee court to become familiar with the issues in this case. Finally, while Mississippi may have an interest in protecting its citizens from wage violations, Illinois also has an interest in redressing wrongs committed by its corporate citizens. *Weber-Stephen Prod., LLC v. Char-Broil, LLC*, No. 16 C 4483, 2016 WL 5871505, at *5 (N.D. Ill. Oct. 5, 2016) (recognizing that Illinois has an interest in redressing wrongs committed by corporations in Illinois). Ultimately, the private interest factors are neutral.

### C. The Koch Defendants Have Not Met Their Burden

Though the Koch Defendants set forth some good reasons to have this case transferred, Plaintiffs have more compelling reasons to have this case remain in this District. On balance, the Koch Defendants have not convinced the Court that the factors favor transfer and therefore, the Court denies the Koch Defendants' Motion to Transfer Venue.

## III. 12(b)(6) Motion to Dismiss Claims Against AL-TN-GA Koch Defendants

The Koch Defendants next argue that the Court must dismiss Plaintiffs' claims against the AL-TN-GA Koch Defendants because Plaintiffs have failed to allege, as required by the FLSA, that the AL-TN-GA Koch Defendants exercised any control over the named Plaintiffs

such that they would qualify as their employer or joint employer.  29 U.S.C. § 203(d) (defining

employer as "any person acting directly or indirectly in the interest of an employer in relation to

[the plaintiff]."); *see also Moldenhauer v. Tazewell-Pekin Consol. Commc'ns Ctr.*, 536 F.3d 640,

644 (7th Cir. 2008) (holding that "each alleged employer must exercise control over the working

conditions of the employee").  Plaintiffs respond by arguing (1) that they have established that

Koch is one company with sham subsidiaries such that each entity is subject to alter ego liability;

and (2) that they have sufficiently alleged that the named Plaintiffs' work benefitted all the Koch

Defendants as joint employers, including the AL-TN-GA Koch Defendants.  The Court first

addresses alter ego liability.

Under Illinois law,[6] to establish alter ego liability, "(1) there must be such unity of

interest and ownership that the separate personalities of the corporation and the individual no

longer exist; and (2) circumstances must be such that adherence to the fiction of separate

corporate existence would sanction a fraud or promote injustice."  *Wachovia Sec., LLC v. Banco

Panamericano, Inc.*, 674 F.3d 743, 751–52 (7th Cir. 2012) (citations and quotations omitted).

When determining whether a unity of interest and ownership exists to justify disregarding

separate corporate identities, courts look to the following factors:

> "inadequate capitalization; failing to issue stock; failing to observe corporate formalities;
> failing to pay dividends; corporate insolvency; nonfunctioning corporate officers; missing
> corporate records; commingling funds; diverting assets to an owner or other entity to
> creditor detriment; failing to maintain an arm's-length relationship among related entities;
> and whether the corporation is a mere façade for a dominant owner."

---

[6] Neither party disputes that Illinois law applies here, and accordingly, the Court "assume[s] both parties
agree that Illinois law applies to the alter ego issue."  *NPF WL, Inc. v. Sotka*, No. 99 C 7966, 2000 WL
574527, at *6 (N.D. Ill. May 10, 2000) ("Absent an argument in support of the application of Ohio law,
we assume both parties agree that Illinois law applies to the alter ego issue, and we will not disturb that
assumption, nor hold otherwise.").  In this case, the Court has original federal jurisdiction over the FLSA
claim, but in determining whether alter ego liability applies, the federal courts look to the law of the
forum state. *In re Schwarzkopf*, 626 F.3d 1032, 1037 (9th Cir. 2010); *see also ABN AMRO, Inc. v. Capital
Int'l Ltd.*, 595 F. Supp. 2d 805, 854 (N.D. Ill. 2008) (applying Illinois law to alter ego claims in federal
securities law action).

*Id.* at 752; *see also Sea-Land Servs., Inc. v. Pepper Source*, 941 F.2d 519, 521 (7th Cir. 1991)

(listing factors including (1) failure to maintain corporate records, (2) commingling of funds or

assets, (3) undercapitalization, and (4) one corporation treating the assets of another corporation

as its own).  No single factor is determinative, *Wachovia*, 674 F.3d at 752, and the Court's

inquiry "invariably involves factual questions to be determined by the circumstances of each

case." *Lumpkin v. Envirodyne Indus., Inc.*, 933 F.2d 449, 463 (7th Cir. 1991).  Alter ego liability

may be applied to FLSA claims.  *Sanchez v. Glob. Parking Mgmt., Inc.*, No. 14-CV-04611, 2015

WL 4429024, at *4 (N.D. Ill. July 20, 2015) (upholding alter ego liability claim in FLSA action;

*Halford v. No Hope Logging, Inc.*, 727 F. Supp. 2d 523, 529 (S.D. Miss. 2010) ("[A]n employer

cannot evade the requirements of the FLSA by forming an alter ego company.").

Several courts in this District have applied these factors and denied motions to dismiss

where plaintiffs have "fairly allege[d]" that entities exist "as the alter ego of another [entity] and

provide[] factual manifestations suggesting" that the entities operate as a single entity.[7] *Flentye*

---

[7] The Koch Defendants imply in their reply brief that, in alleging alter ego liability, Plaintiffs must meet the heightened pleading standards required under Federal Rule of Civil Procedure 9(b).  (Reply to Pls. Resp. to Mot. to Dismiss 27 (stating that Plaintiffs have not alleged the "who, what, when, and where of any alleged fraud."))  While Rule 9(b) applies to averments of fraud, the Koch Defendants have not provided any legal authority holding that Rule 9(b)'s heightened requirements are required for allegations of alter ego liability, and they do not even mention Rule 9(b) in their Reply or their initial Motion to Dismiss.  In fact, several courts in this District have applied the notice pleading standard of Federal Rule of Civil Procedure 8 in analyzing alter ego allegations.  *See, e.g.*, *Flentye*, 485 F. Supp. 2d at 913 ("If the Complaint fairly alleges an entity exists as the alter ego of another and provides factual manifestations suggesting the existence that the two operate as a single entity, a motion to dismiss will be denied.") (citations omitted); *United States v. All Meat & Poultry Prod. Stored at Lagrou Cold Storage*, 470 F. Supp. 2d 823, 828 (N.D. Ill. 2007) (applying notice pleading standard to alter ego allegations); *U.S. ex rel. Tyson v. Amerigroup Illinois, Inc.*, No. 02 C 6074, 2005 WL 3050610, at *5 (N.D. Ill. Nov. 8, 2005) ("Plaintiffs are not required to allege the specific factual bases for their alter-ego claim."); *Manufacturers Life Ins. Co. (U.S.A.) v. 1 Animation Network, Inc.*, No. 04 C 8105, 2005 WL 1323421, at *2 (N.D. Ill. May 26, 2005) ("The specificity sought by Defendants is not required under the notice pleading standard."); *Hann v. The Paul Revere Ins. Co.*, No. 03 C 1062, 2004 WL 557380, at *2 (N.D. Ill. Feb.17, 2004) (stating that if a plaintiff alleges an alter ego relationship, "dismissal of her complaint is unwarranted if she alleges any facts which suggest that the corporations operated as a single entity").  In this case, Plaintiffs have sufficiently alleged alter ego liability under either standard, so the Court need not

*v. Kathrein*, 485 F. Supp. 2d 903, 913 (N.D. Ill. 2007). In *All Meat*, 470 F. Supp. 2d at 825, for example, the plaintiffs brought a lawsuit against a food storage facility and several related entities and individuals for breach of contract. The court denied the defendants' motion to dismiss the plaintiffs' allegations that all the entities and individual defendants could be held liable under an alter ego theory. *Id.* at 828. The court reasoned that the plaintiffs' allegations that "the corporate defendants h[e]ld themselves out as one integrated system and operate[d] as such" and that the individual defendant who owned the primary corporate entity "manage[d] each of the corporate defendant [entities] and operate[d] them as mere instrumentalities of his own enterprise" were sufficient to survive the motion to dismiss. *Id.*

Similarly, in *Tyson*, WL 3050610, at *5, the plaintiffs brought a False Claims Act lawsuit, and the court denied the defendants' motion to dismiss and found that the plaintiffs had sufficiently alleged the necessary factors to establish an alter ego relationship between the defendant entities. Specifically, the court noted that the plaintiffs alleged that the parent entity controlled "every aspect of [the subsidiary's] operations," including the development of the policies that allowed the subsidiary to issue false claims. *Id.* The court emphasized that executives of the parent entity discussed and ultimately decided to implement the key policy at issue at the subsidiary entity. *Id. See also Fuller v. Midland Credit Mgmt. Inc.*, No. 11 C 5111, 2014 WL 883757, at *8 (N.D. Ill. Mar. 6, 2014) (denying motion to dismiss alter ego claim because plaintiff alleged parent entity devised key policies for subsidiary, parent officers worked out of subsidiary office, corporate form existed only to insulate parent from FDCPA liability, and subsidiary acted at direction of parent); *ABN AMRO*, 595 F. Supp. 2d at 855 (refusing to dismiss alter ego allegations because parent entity controlled subsidiary and used subsidiary to "enhance

determine whether the heightened pleading requirement applies.

its own profits"); *Kellers Sys., Inc. v. Transp. Int'l Pool, Inc.*, 172 F. Supp. 2d 992, 1001 (N.D. Ill. 2001) (plaintiffs sufficiently alleged alter ego because entities commingled assets and used accounts interchangeably such that they could be considered a single entity).

Courts have applied similar reasoning to claims for alter ego liability in FLSA cases. In *Powers v. Emcon Assocs., Inc.*, No. 14-CV-03006-KMT, 2016 WL 1111708, at *7–8 (D. Colo. Mar. 22, 2016), for example, the plaintiffs asserted claims against two corporate defendants alleging violations of the FLSA. The plaintiffs' employment contract was with one entity, FMNow, and the plaintiffs alleged that another entity, Emcon, should also be held liable under an alter ego theory. *Id*. at *7. The court found that the plaintiffs had sufficiently alleged that the two entities were alter egos for several reasons, including: (1) the plaintiffs performed services for both entities; (2) executives from both entities oversaw the plaintiffs' work; (3) the entities used joint business cards and email addresses; (4) FMNow made termination decisions for Emcon employees; (5) when FMNow could not pay an employee, Emcon placed that employee on its payroll without any change in job duties; and (6) the entities held themselves out on their website as one entity. *Id.* at *7-8. Additionally, the court held that the plaintiffs' allegations that the entities had failed to compensate employees in line with their employment contracts satisfied the "sanction a fraud" or "promote injustice" prong of the alter ego test. *Id.* at *8.

Several other courts have similarly upheld FLSA claims based on alter ego liability. *See, e.g.*, *Sanchez*, WL 4429024, at *4 (finding plaintiffs sufficiently alleged alter ego liability in FLSA case where defendants formed entity to "protect their assets in case they [were] found liable" for plaintiffs' claims); *Barba v. Seung Heun Lee*, No. CV 09-1115-PHX-SRB, 2009 WL 8747368, at *5–7 (D. Ariz. Nov. 4, 2009) (finding plaintiffs sufficiently alleged alter ego liability in FLSA minimum wage case where defendant used several corporate entities that were

effectively all a single entity to limit liability); *Tlacoapa v. Carregal*, 386 F. Supp. 2d 362, 366

(S.D.N.Y. 2005) (upholding FLSA verdict based on alter ego liability where entities commingled

accounts and funds); *Boland v. Universal Spray Applications, Inc.*, No. 87 C 4673, 1989 WL

6498, at *3 (N.D. Ill. Jan. 25, 1989) (allowing alter ego claims to survive summary judgment in

FLSA case where parent supervised subsidiary and controlled its management).

Viewing the allegations in the light most favorable to Plaintiffs, Plaintiffs have

sufficiently alleged that the Koch Defendant entities are so intertwined that there is "unity of

interest and ownership" such that the individual Koch entities do not exist as "separate

personalities." Specifically, Plaintiffs have alleged the following facts to support their alter ego

allegations:

- The Koch entities utilize a centralized reporting and management structure. (Am. Compl. ¶ 53.)
- Koch Foods sets the policies and practices that govern the chicken catching operations at the Koch Complexes. (*Id.* ¶¶ 119-20.)
- Koch Foods exercises operational, financial, and managerial control over the Koch entities. (*Id.* ¶¶ 80, 94-96, 119-20.)
- Koch Foods profits are entirely dependent on funds from the Koch Complexes. (*Id.* ¶ 78.)
- The Koch entities comingle corporate accounts and funds, including transferring funds between corporate accounts on a daily basis. (*Id.* ¶¶ 25, 53, 79, 81, 84.)
- The Koch entities all share key managerial employees. (*Id.* ¶¶ 67, 80, 84.)
- The Koch Foods CEO and COO are officers and the key decision makers for all the Koch entities. (*Id.* ¶¶ 72, 86.)
- The Koch entities all use one email domain and hold themselves out on their website as one, integrated entity. (*Id.* ¶¶ 17, 21-22, 69.)
- The Koch entities share supplies and products. (*Id.* ¶¶ 23, 133.)

In this case, Plaintiffs have thus made allegations similar to allegations that other courts have

found were sufficient to support alter ego liability. Like in *All Meat*, here, the Koch entities have

held "themselves out as one integrated system and operated as such." 470 F. Supp. 2d at 828.

Like in *Tyson*, the Koch Foods parent entity controlled all the major operations and policy

decisions at the subsidiary Koch entities, including the policies that led to the claims at issue in

this case.  In short, Plaintiffs have "fairly allege[d]" and provided "factual manifestations" that the Koch entities have a unity of interest such that they exist and operate as a single entity. *Flentye*, 485 F. Supp. 2d at 913.

With respect to the Koch Defendants' argument that Plaintiffs have not alleged the second prong of the alter ego test and that there is no reason to believe "that adherence to the fiction of [the Koch Defendants'] separate corporate existence would sanction a fraud or promote injustice," the Court disagrees.  Plaintiffs have alleged that the Koch Defendants utilized a fictional corporate structure with multiple separately registered subsidiaries in order to limit their liability.  (Am. Compl. ¶¶ 14, 18.)  Allowing the Koch Defendants to use a fictional corporate structure to avoid compensating employees fairly under the FLSA would "promote injustice," and therefore, Plaintiffs have satisfied the second prong of the alter ego test.  *Powers*, WL 1111708, at *8 (finding that failing to adequately compensate employees satisfied the "sanction a fraud" or "promote injustice" prong of the alter ego test).

Construing the Complaint "liberally, in its entirety, and with every inference drawn in favor" of Plaintiffs, *see Phencorp*, 440 F.3d at 877-78, Plaintiffs have sufficiently alleged that Koch is one integrated entity such that all the Koch Defendants are subject to alter ego liability. Accordingly, the Court denies the Koch Defendants' motion to dismiss Plaintiffs' claims against the AL-TN-GA Koch Defendants.[8]

## IV. Standing

The Koch Defendants next argue that the Court must dismiss Plaintiffs' claims relating to activities in Alabama, Tennessee, and Georgia because Plaintiffs lack standing to assert claims

---

[8] Because the Court has denied the Koch Defendants' motion to dismiss Plaintiffs' claims against the AL-TN-GA Koch Defendants on the basis of alter ego liability, it need not address Plaintiffs' joint employer argument.

for work activities performed outside of Mississippi because they did not work in those states and suffered no injuries in those states. Plaintiffs respond that they have standing based both on their alter ego theory and because Plaintiffs' injuries are fairly traceable to the actions of all the Koch Defendant entities. Plaintiffs also argue, in the alternative, that this Court should defer any standing decision until after it decides whether to certify the proposed class.

Federal courts' jurisdiction depends on whether a plaintiff has constitutional standing. *Meyers v. Nicolet Rest. of De Pere, LLC*, 843 F.3d 724, 726 (7th Cir. 2016) ("standing is a threshold question in every federal case because if the litigants do not have standing to raise their claims the court is without authority to consider the merits of the action") (citations omitted). To establish standing, a plaintiff must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016), *as revised* (May 24, 2016) (citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61 (1992)).

As discussed at length above, at this stage, Plaintiffs have sufficiently alleged that the Koch entities, including those outside of Mississippi, have a unity of interest such that they exist and operate as a single entity. Given that the Koch Defendants operate as a single entity, Plaintiffs have established standing to sue all the Koch entities based on the injuries they suffered at one of the Koch Defendants' outposts—the Mississippi Complex. The Koch Defendants argue that no court has allowed a plaintiff to assert standing in an FLSA case based on alter ego theories, but in the two cases this Court has identified in which courts considered alter ego as a basis for standing in FLSA cases, the courts merely found that the plaintiffs had not sufficiently alleged their alter ego theories. *See Sandoval v. Ali*, 34 F. Supp. 3d 1031, 1039 (N.D. Cal. 2014); *Cattie v. Wal-Mart Stores, Inc.*, 504 F. Supp. 2d 939, 945–46 (S.D. Cal. 2007).

Those courts did not hold that alter ego liability could not serve as the basis for a plaintiff to assert standing, and in fact, in both cases, the courts implied—by considering the plaintiffs' alter ego allegations for purposes of standing—that the plaintiffs would have established standing had they successfully alleged alter ego liability.  *Id.* (finding that because plaintiff could not establish alter ego liability, she could not show her injury was traceable to the actions of the parent entity); *Sandoval*, 34 F. Supp. 3d at 1039 (analyzing standing based on alter ego theory but finding that plaintiffs did not sufficiently allege alter ego).  Here, unlike in *Sandoval* and *Cattie*, Plaintiffs have sufficiently alleged alter ego liability and thus, they have sufficiently alleged that they suffered injuries that are traceable to the Koch entity as a whole, which operates in Alabama, Georgia, and Tennessee, as well as Mississippi and Illinois.

Additionally, in other areas of law,[9] courts have found that plaintiffs had standing based on alter ego theories.  In *ADEMA Techs., Inc. v. Eiffert*, No. 13-CV-01139-CMA-BNB, 2014 WL 1099770, at *1 (D. Colo. Mar. 19, 2014), for example, the plaintiff asserted conversion and theft claims against an individual and a corporate defendant and argued that it had standing to assert such claims based on an alter ego theory of liability.  The district court rejected a

_____

[9] In a slightly different context, in patent law cases, courts have also upheld plaintiffs' assertions of standing based on alter ego theories.  In *Software Rights Archive, LLC v. Google Inc.*, No. CIV.A. 2:07-CV-511, 2009 WL 901361, at *1 (E.D. Tex. Mar. 31, 2009), for example, the plaintiffs brought a patent infringement action.  The defendants moved to dismiss for lack of standing arguing that the plaintiffs were not the assignee of the patents in question because the entity that assigned the patent to the plaintiffs was not the proper title holder of the patents at the time of assignment.  *Id.* at *2-3.  The court found that the entity that assigned the patent to the plaintiff, although not the technical holder of the patent, was in fact a legitimate holder of the patent because the entity was the alter ego of another entity that properly held the patent.  *Id.* at *3.  Accordingly, the court found that the plaintiffs had standing.  *Id.* In another patent case, *Gerawan Farming, Inc. v. Rehrig Pac. Co.*, No. 1:11-CV-01273 LJO, 2013 WL 1414637, at *4–6 (E.D. Cal. Apr. 8, 2013), *aff'd*, 587 F. App'x 654 (Fed. Cir. 2014), the plaintiff asserted standing to bring a claim for a "correction of inventorship" based on the theory that he was an alter ego of the company that owned the patent and thus he personally had an ownership interest in the patent.  At the summary judgment stage, the court found that a trier of fact could conclude that the plaintiff was the alter ego of the company-patent owner, and accordingly could conclude that the plaintiff had standing to assert claims related to the patent.  *Id.* at *6.

magistrate judge's recommendation to dismiss the case for lack of standing and found that the plaintiff had in fact sufficiently alleged alter ego liability and thus, had sufficiently alleged standing against the alter ego defendants. *Id.* Noting that "a claim based on the alter ego theory is not in itself a claim for substantive relief, but is instead a theory of liability," the court found that the plaintiff had standing because it sought "to pursue its claims based on alter ego theory." *Id.* at *2.

Here, Plaintiffs have sufficiently alleged that the Koch Defendants have uniform corporate policies and practices relating to their chicken catching operations and live-haul crews. Koch Foods sets these policies, they are implemented at the Complexes in Alabama, Georgia, Tennessee, and Mississippi with Koch Foods' corporate oversight, and the profits flow back to Koch Foods. Under this alter ego theory, Plaintiffs have sufficiently alleged that the Koch Defendants operate as a single, integrated entity, and like in *ADEMA*, here, Plaintiffs thus have standing to bring suit against the multiple defendants that form that single entity, regardless of their corporate alter egos. Accordingly, the Court denies Koch Defendants' motion to dismiss for lack of standing.[10]

---

[10] Because Plaintiffs have standing based on their alter ego theory of liability, the Court need not address their argument that the Court should defer making a standing decision until after the Court decides conditional certification. The Court notes, however, that several courts have deferred standing decisions until class certification in analogous cases where the defendants claim that the named plaintiffs from one state lack standing to assert claims under the laws of other states where other potential class members may be located. *See, e.g.*, *Supreme Auto Transp. LLC v. Arcelor Mittal*, No. 08 CV 5468, 2017 WL 839484, at *2 (N.D. Ill. Mar. 3, 2017); *Halperin v. Int'l Web Servs., LLC*, 123 F. Supp. 3d 999, 1009 (N.D. Ill. June 5, 2015) (explaining that argument that plaintiff lacked standing to raise claims under other state laws was "more accurately characterized as an attack not on [plaintiff's] Article III standing . . . but rather his ability under Rule 23 to represent a multi-state class"); *In re Aftermarket Filters Antitrust Litig.*, No. 08 C 4883, 2009 WL 3574041, at *5 (N.D. Ill. 2009).

## CONCLUSION

For the foregoing reasons, the Court denies the Koch Defendants' motion to dismiss in its entirety.

**Dated:**   May 15, 2017

_____
AMY J. ST. EVE
United States District Court Judge