## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| JIMMY R. NICKS and JAMES EARL PATRICK, individually and on behalf of all persons similarly situated, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 16-cv-6446 |
| | ) | |
| KOCH MEAT CO., INC., d/b/a KOCH FOODS, KOCH FOODS OF MISSISSIPPI, LLC, and JET POULTRY SERVICES, INC., | ) ) ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

On December 22, 2016, Plaintiffs Jimmy R. Nicks ("Nicks") and James Earl Patrick ("Patrick"), individually and on behalf of all persons similarly situated, filed an Amended Collective Class Action Complaint against Defendants Koch Foods, Inc. ("Koch Foods"), Koch Meat Co., Inc. d/b/a Koch Poultry Co. ("Koch Meat"), Koch Foods of Mississippi ("Koch Foods MS"), JET Poultry Services, Inc. ("JET"), and several other Koch subsidiaries operating in Georgia, Alabama, and Tennessee ("AL-TN-GA Koch Defendants"), collectively "Defendants," seeking relief under the Fair Labor Standards Act of 1938, 29 U.S.C. § 201, *et seq*. ("FLSA"). (R. 99.) The Court denied Defendants' motion to dismiss on May 15, 2017, and Plaintiffs have now moved for conditional certification and authorization to facilitate notice pursuant to 29 U.S.C. § 216(b). (R. 136.)

For the following reasons, the Court grants Plaintiffs' motion.

## PROCEDURAL HISTORY

Plaintiffs initially filed a collective action against Defendants on June 21, 2016 on behalf of all individuals employed by Defendants as members of live-haul, chicken catching crews in the United States. (R. 1, Compl. ¶ 14.) JET filed a motion to dismiss on August 3, 2016, and Koch Foods MS filed a motion to dismiss on August 4, 2016. Both motions claimed the Court should dismiss this case for lack of personal jurisdiction and alternatively, for improper venue. On October 27, 2016, the Court denied Koch Foods MS's motion to dismiss without prejudice and granted Plaintiffs permission to conduct limited jurisdictional discovery related to the Koch Defendants' corporate structure, operations, and internal governance structure. (R. 82, Mem. Op. and Order 4.) The Court reserved opinion on the Koch Defendants' venue challenge under 28 U.S.C. 1391(b)(1) and granted limited venue discovery relating to (b)(2). (*Id*. 7.) In compliance with the Court's order, Plaintiffs ordered discovery on the Koch Defendants and conducted relevant depositions.

On December 19, 2016, Plaintiffs and JET entered into a settlement agreement. (R. 101, Ex. 1, Settlement Agreement with JET.) As part of the settlement, JET agreed that the Court would retain jurisdiction with respect to the enforcement of the settlement terms and that JET would "submit to the jurisdiction of the Court for purposes of interpreting, implementing, and enforcing the settlement." (*Id.* ¶ 14.) On January 11, 2017, the Court approved the settlement and dismissed the claims against JET with prejudice. (R. 105.)

Based on the limited jurisdictional and venue discovery, Plaintiffs filed the First Amended Complaint, in which Plaintiffs added certain Koch Defendants and modified their allegations. (R. 9, Am. Compl.) The Koch Defendants subsequently filed a motion to dismiss,

or alternatively transfer, and as noted above, the Court denied that motion. (R. 31, May 15, 2017 Order.)

## BACKGROUND

In considering this motion, the Court presumes familiarity with the background of this action as set forth in the May 15, 2017 Order and does not recite a detailed background here. The Court will, however, provide a factual background as it pertains to Plaintiffs' allegations that they and the other potential claimants are similarly situated.

Plaintiffs were "previously employed to catch and cage Koch's chickens as member[s] of a live-haul chicken catching crew[.]" (Am. Compl. ¶¶ 10-11.) According to Plaintiffs, Koch Foods[1] has a policy and practice of failing to pay overtime premiums and minimum wage to the individuals, like Plaintiffs, who catch chickens at Koch's subsidiary farms in Mississippi, Alabama, Georgia, and Tennessee. (*Id.* ¶ 2.)

### I.    Koch Corporate Structure

Plaintiffs allege that although the Koch Defendants have organized themselves as several separately registered companies, these companies are unified in interest and ownership. (*Id.* ¶ 14.) Koch Foods is the parent company of the Koch LLC subsidiaries, including Koch Meat and the eight separate divisions, each of which is referred to as a "Complex," that handle live growing and processing of chickens for Koch in Mississippi, Alabama, Georgia, and Tennessee. (*Id.* ¶¶ 15, 27.) Koch Meat, the original Koch entity that preceded the creation of Koch Foods,

---

[1] Although Koch Foods is organized as several different entities, Plaintiffs have alleged that there is such unity of interest and ownership among the different entities that they do not exist independently and are in essence one entity. In its Order on Defendants' motion to dismiss, the Court held that, at this stage, Plaintiffs had sufficiently alleged alter ego allegations. Accordingly, the Court refers to all Defendants collectively as "Defendants" or "the Koch Defendants" and refers to "Koch Foods" as the Koch corporate parent entity for purposes of this motion.

directly pays the officers, directors, and other employees of Koch Foods, as well as the managers of the eight Complexes. (*Id.* ¶ 28.)

The eight Koch Complexes are each registered as limited liability companies ("LLCs") in the state in which they are located, with facilities in-state, but with a corporate headquarters in Illinois. (*Id.* ¶¶ 29-50.)[2]  The Complexes are organized into an Eastern and Western Region, and each Region has a Vice President ("VP") who reports directly to the President and the Chief Operating Officer of Koch Foods, both of whom are located at Koch's Corporate Headquarters in Illinois. (*Id.*)  Plaintiffs allege that the finances of each Complex are "consolidated with the ultimate goal of increasing the profitability of the entity at a whole." (*Id.* ¶ 16.) Plaintiffs allege that at each Complex there is a "Foods" entity that processes the chickens and a "Farms" entity that grows the chickens, although the entities have the same management and reporting structure. (*Id.* ¶ 18.)  The Foods entities pay all employees at a given Complex, regardless of whether the employee works in the grow-out operation or the chicken processing operation. (*Id.*)

Each Complex has a Complex Manager, who oversees the live production and processing operations at that Complex. (*Id.* ¶ 73.)  The Complex Managers report to the corresponding Eastern or Western Region VPs, who are responsible for managing the Complexes' operations, including reducing the Complexes' labor costs when possible. (*Id.* ¶¶ 73-74.)  The Region VPs are Koch Foods employees who oversee multiple Koch subsidiaries. (*Id.* ¶ 74.)  Plaintiffs allege that the Complex employees must abide by the directives of the Region VPs. (*Id.* ¶ 75.)  Koch Foods, for example, holds weekly conference calls, led by Koch Foods Cost Controller, Wayne Brantley, in which each Complex provides operational reports to the COO and the Region VPs.

---

[2] There are Koch Complexes in Alabama (Montgomery, Gadsden, Collinsville, and Ashland), Mississippi (Morton), Tennessee (Chattanooga and Morristown), and Georgia (Pine Mountain Valley). (*Id.* ¶¶ 14, 32-49.)

(*Id.*)  Each Complex also has a Controller, who is responsible for maintaining the books and records for the Complex and reporting the financial results to Koch Foods CFO Lance Buckert ("Buckert") at the end of every month.  (*Id.* ¶ 76.)  The Koch Defendants also share key managerial employees, such as Cost Controller, Director of Purchasing, and Senior Director Quality Assurance.  (*Id.* ¶ 77.)

## II.     Koch Chicken Catching Operations

Koch Foods produces poultry products for human consumption worldwide and thus requires large quantities of chickens for its processing operations.  (*Id.* ¶ 63.)  Koch Foods hatches chicken in Koch-owned hatcheries and ships them to poultry growers.  (*Id.* ¶ 65.)  Koch chickens are all raised "cage free," and Koch Foods only retrieves the chickens for processing once they reach a marketable age and size.  (*Id.* ¶ 69.)  Plaintiffs allege that Koch Foods, through each of the Koch Complexes, employs crews of chicken-catchers like Plaintiffs who operate in substantially the same manner, regardless of the Complex at which they work.  (*Id.* ¶¶ 87, 90.) According to Plaintiffs, the live-haul catching crews are critical to the Koch Defendants' chicken processing business and allow it to produce large-scale poultry products for interstate distribution.  (*Id.* ¶ 88.)  Each live-haul crew consists of eight to twelve chicken-catchers, one or two forklift operators, and a crew leader.  (*Id.* ¶ 89.)

Plaintiffs allege that prior to 2012, the Koch Defendants used a combination of direct employee chicken catching crews and crews provided by third party staffing companies, but the services provided by both types of crews was identical.  (*Id.* ¶¶ 92-93.)  In the 2012 to 2013 time period, the Koch Defendants began exclusively using third party contractors to staff its live-haul crews because they were having difficulty maintaining a labor force to serve on the chicken catching crews.  (*Id.* ¶¶ 55, 94.)  Koch Foods COO Mark Kaminsky and the Region VPs

approved this decision. (*Id.* ¶ 95.) Koch Foods has engaged 11 contractors, but there is significant overlap in the ownership of many of those contractors,[3] and all the contractors provide substantially similar services regardless of the Complex with whom they are contracting. (R. 138, Ex. A, Keyes Dep. 163: 24 – 164: 10.) Plaintiffs claim that Koch Foods, through the subsidiary Complexes, pays the third party contractors, including JET,[4] based on the number of chickens caught, and the third party contractors in turn pay the members of the chicken catching crews. (Am. Compl. ¶¶ 56, 100-02; R. 138, Exs. L-V, Contractor Agreements.) Plaintiffs further allege that Koch Foods does not pay the third party contractors enough for them to pay their employees minimum wage and overtime pay and still operate profitably. (*Id.* ¶ 103.)

Plaintiffs allege that although the Koch Defendants use third party staffing contractors for their live-haul crews, the contractors and Koch are joint employers of Plaintiffs and other members of the crews. (*Id.* ¶ 104.) Plaintiffs claim that the Koch Defendants maintain operational control over the day-to-day functions of Plaintiffs and every aspect of the chicken catching operation. (*Id.* ¶¶ 105, 108.) Plaintiffs travel to Koch Foods' farms to capture the chickens and they place them in Koch cages for transport to Koch Foods' processing plants at each of the Koch Complexes. (*Id.* ¶ 106.) Plaintiffs allege that JET and the other third party staffing companies merely provide the "human labor," but the equipment and materials they use, as well as the chickens they catch, belong to Koch. (*Id.* ¶¶ 109-10.) The staffing companies

---

[3] 6 of the 11 contractors have similar owners and/or representatives. (R. 138, Ex. I, Omnibus Resp., Interrog. No. 1; Ex. W, Defs.' Initial Disclosures 6, 13, 25.) For example, Richard Armstreet owns Jet Poultry (contractor for Mississippi Complex) and Legroad, Inc. (contractor for Montgomery Complex) and Eugene Byrum is the owner and/or representative of Byrum & Byrum Poultry (contractor for Chattanooga Complex) and Trade Poultry Contractors (contractor for Gadsden Complex).

[4] JET is one of the Koch's third party contractors, and the Court approved a settlement between JET and Plaintiffs on January 11, 2017. (R. 104, Order Approving Settlement.) Plaintiffs allege JET submits weekly invoices to the Koch subsidiary at each Complex it services, and then Koch Farms of Mississippi issues payments to JET from its bank account in Illinois. (Am. Compl. ¶ 58.)

transport the crew members from their homes to the Koch farms, and after the shift is complete, the companies drop off the crew members at their homes. (*Id.* ¶ 113.) The pick-up and drop-off process can take up to two hours each way, and the Koch Defendants set the work locations and shift durations. (*Id.*) Plaintiffs allege that each contractor has a similar agreement with Koch to catch and load chickens pursuant to scheduled Koch provides. (*Id.* ¶ 109; Keyes Dep. 165: 1-7; Contractor Agreements.)

According to Plaintiffs, the Koch Defendants also largely control the rate and method of payment to Plaintiffs at each of the Complexes by paying the staffing companies on a piece rate basis with such thin margins that it is impossible for the companies to pay overtime and minimum wage. (*Id.* ¶ 114.) The Koch Defendants maintain the chicken catching records upon which they base their payments to the staffing companies, and the Koch Defendants determine the work schedules and conditions of Plaintiffs' employment. (*Id.* ¶¶ 115-16; Keyes Dep. 120: 12-21, 108: 4-15; R. 138 Berman Dep. 6: 10 – 7: 4.) The Live Haul Operations Manager at each Complex supervises the work of the live-haul crews and dictates their daily schedules and working conditions as well as the number of chickens they need to catch. (Am. Compl. ¶ 117; Keyes Dep. 106: 22 – 107: 10.) Koch employees also set the growing and catching requirements as directed by Koch Foods in Illinois. (Am. Compl. ¶ 118.) Specifically, Koch Foods dictates the times at which chickens are put in cages and how many chickens are put in cages based on specific factors related to Koch Foods' processing plants that Koch Foods' employees monitor. (*Id.* ¶¶ 119-20; Keys Dep. 108: 4-15.) The Koch Complexes also employ an internal auditor and an independent auditor who visit the work sites to ensure that the live-haul crews are adhering to Koch's directives and if there are any aberrations, the Quality Control department at Koch Foods or the Koch Complex notifies the staffing companies that the crews must follow Koch's

7

directives. (Am. Compl. ¶¶ 122-23.) The Koch Complexes also employ Live Haul Supervisors on-site who oversee the catching practices and ensure that the live-haul crews are following Koch's directives. (*Id.* ¶ 124.) Both the Koch Defendants and the third party staffing companies retain the right to hire and terminate live-haul crew members. (*Id.* ¶ 125.)

Plaintiffs allege that regardless of the Complex or state, the live-haul crews' work is uniform. (*Id.* ¶ 126.) According to one Koch Live Production Manager, "there is only one way to catch a chicken." (Keyes Dep. 156: 11.) On a typical work day, vans pick up the crews at their respective homes on a route that Koch Foods and the Koch Complexes determine based on the availability of Koch's processing plans. (Am. Compl. ¶ 113, 126.) The vans take the crew members several miles away from their homes to farms where they spend the day catching chickens. (*Id.*) Their work requires no specialized training, is unskilled, repetitive work, and does not involve raising poultry. (*Id.* ¶¶ 127-28.) Live-haul crews typically work ten to twelve hours per day, five to six days per week, catching tens of thousands of chickens each day. (*Id.* ¶¶ 129-30.) Once they place the chickens in the cages, the crew forklift operator moves the cages onto trucks owned by the Koch Defendants for transport to the processing plant at a Koch Complex. (*Id.* ¶ 131; R. 138, Ex. C, Mitchell Decl. ¶ 5; Ex. D. Burkes Decl. ¶ 7.) The Koch Defendants own the forklifts and cages used by the crews and they also own the chickens, the chicken feed, and the trucks used to distribute the chicken feed. (Am. Compl. ¶¶ 132-33; Mitchell Decl. ¶ 5; Burkes Decl. ¶ 7.)

III.    **Pay-Related Allegations**

Plaintiffs allege that all crew members are non-exempt employees paid on a piece-rate basis per 1,000 chickens caught. (*Id.* ¶ 134.) According to Plaintiffs, Defendants require crew members to work hours in excess of 40 hours per week, but do not pay them overtime or

compensate them for travel time or time spent waiting for the Koch Defendants' machines to become available. (*Id.* ¶¶ 136-37; Mitchell Decl. ¶¶ 7-8; Burkes Decl. ¶¶ 7-8.) Plaintiffs contend that Defendants do not properly record the number of hours worked by crew members, and accordingly, do not pay crew members minimum wage or pay them overtime premium for hours worked over 40 hours per work. (Am. Compl. ¶¶ 138-40; Mitchell Decl. ¶¶ 7-8; Burkes Decl. ¶¶ 7-8.) The Koch Defendants have not advised the third party staffing companies that they are obligated to pay overtime and minimum wage, and in fact, the Koch Defendants' negotiated prices do not account for minimum wage or overtime costs. (Am. Compl. ¶¶ 145-46.) As a result, Plaintiffs allege that Defendants have violated the FLSA provisions relating to minimum wage and overtime pay. (*Id.* ¶¶ 167, 182.)

## LEGAL STANDARD

### I.     FLSA Collective Actions—29 U.S.C. § 216(b)

Pursuant to the FLSA, "employees are entitled to overtime pay (i.e., one and one-half times the regular rate) for any hours worked in excess of forty hours per week, unless they come within one of the various exemptions set forth in the Act." *Schaefer–LaRose v. Eli Lilly & Co.*, 679 F.3d 560, 572 (7th Cir. 2012) (citing 29 U.S.C. §§ 207, 213). Section 216(b) of the FLSA "gives employees the right to bring their FLSA claims through a 'collective action' on behalf of themselves and other 'similarly situated' employees." *Alvarez v. City of Chi.*, 605 F.3d 445, 448 (7th Cir. 2010) (citing 29 U.S.C. § 216(b) (2006)); *see Schaefer v. Walker Bros. Enterprises*, 829 F.3d 551, 553 (7th Cir. 2016) ("Suits under the Fair Labor Standards Act cannot proceed as class actions. Instead they are opt-in representative actions."). District courts have broad discretion in managing collective actions under the FLSA. *Alvarez*, 605 F.3d at 449.

"The conditional approval process is a mechanism used by district courts to establish whether potential plaintiffs in the FLSA collective action should be sent a notice of their eligibility to participate and given the opportunity to opt in to the collective action." *Ervin v. OS Rest. Servs., Inc.*, 632 F.3d 971, 974 (7th Cir. 2011). "Neither Congress nor the Seventh Circuit has specified the procedure courts should use to decide FLSA certification and notice issues, but collective FLSA actions in this district generally proceed under a two-step process." *Grosscup v. KPW Mgmt., Inc.*, No. 16 C 06501, 2017 WL 2461538, at *1 (N.D. Ill. June 7, 2017) (citations and quotations omitted). This case is at step one, the conditional certification stage. The purpose of conditional certification is to determine the size and contour of the group of employees who may become collective members and whether these potential members are "similarly situated." *See* 7B Charles A. Wright et al., *Federal Practice & Procedure* § 1807; *see also Gomez v. PNC Bank, Nat'l. Assoc.*, 306 F.R.D. 156, 173 (N.D. Ill. 2014); *Ervin*, 632 F.3d at 974 ("[t]he conditional approval process is [ ] used by district courts to establish whether potential plaintiffs . . . should be sent a notice of their eligibility to participate and given the opportunity to opt in to the collective action.").

At this first stage, the plaintiffs have the burden of showing that other potential claimants are similarly situated by making a "modest factual showing sufficient to demonstrate that they and potential plaintiffs together were victims of a common policy or plan that violated the law." *Id.; Bergman v. Kindred Healthcare, Inc.*, 949 F. Supp. 2d 852, 855 (N.D. Ill. 2013) (requiring "modest factual showing of common, unlawful conduct and provide some indication of harm to employees."). "Courts use a 'lenient interpretation' of the term 'similarly situated' in deciding whether plaintiffs meet this burden." *Grosscup*, WL 2461538, at *1 (quoting *Salmans v. Byron Udell & Assocs., Inc.*, No. 12 C 3452, 2013 WL 707992, at *2 (N.D. Ill. Feb. 26, 2013)). To

determine whether plaintiff has made the required modest factual showing, "plaintiffs must provide some evidence in the form of affidavits, declarations, deposition testimony, or other documents to support the allegations that other similarly situated employees were subjected to a common policy that violated the law." *Pieksma v. Bridgeview Bank Mortg. Co., LLC*, No. 15 C 7312, 2016 WL 7409909, at *1 (N.D. Ill. Dec. 22, 2016) (internal quotations omitted). Conditional certification is not, however, automatic and to proceed as a collective action, plaintiffs must "demonstrate similarity among the situations of each plaintiff beyond simply claiming that the FLSA has been violated; an identifiable factual nexus that binds the plaintiffs together as victims of a particular violation of the overtime laws generally must be present." *Briggs v. PNC Fin. Servs. Grp., Inc.*, No. 15-CV-10447, 2016 WL 1043429, at *2 (N.D. Ill. Mar. 16, 2016) (citations omitted). If the plaintiffs are able to show that other potential plaintiffs are similarly situated, courts may conditionally certify the case as a collective action and allow the plaintiffs to send notice of the case to similarly situated employees who may then opt in as plaintiffs. *Grosscup*, WL 2461538, at *1; *Salmans*, 2013 WL 707992, at *2.

At this initial stage, "[t]he court does not make merits determinations, weigh evidence, determine credibility, or specifically consider opposing evidence presented by a defendant." *Bergman*, 949 F. Supp. 2d at 855-56 (citation omitted); *see also Larsen v. Clearchoice Mobility, Inc.*, No. 11 C 1701, 2011 WL 3047484, at *1 (N.D. Ill. July 25, 2011) ("[T]he court does not resolve factual disputes or decide substantive issues going to the merits."); *Nehmelman v. Penn Nat'l Gaming, Inc.*, 822 F. Supp. 2d 745, 751 (N.D. Ill. 2011) ("[T]he court does not consider the merits of a plaintiff's claims, or witness credibility").

The second step, which is not at issue here and occurs after the opt-in and discovery process has been completed, is more stringent. Once the court has determined which employees

11

will be part of the collective action, the court must reevaluate the conditional certification to determine whether there is sufficient similarity between the named and opt-in plaintiffs to allow the matter to proceed to trial on a collective basis. *Grosscup*, WL 2461538, at *1; *Nehmelman*, 822 F. Supp. 2d at 751. "If the court finds insufficient similarities during the second step, it may revoke conditional certification or divide the class into subclasses." *Grosscup*, WL 2461538, at *1 (quotations and citations omitted).

## <u>ANALYSIS</u>

Here, Plaintiffs have moved for conditional certification and to facilitate notice to potential plaintiffs. The Court first addresses Plaintiffs' arguments for conditional certification and then considers their proposed Notice of Collective Action Lawsuit and Opt-In Consent Form. (R. 136, Ex. A, Notice of Collective Action Lawsuit; Ex. B, Opt-In Consent Form.)

## I.     Conditional Certification

### A.  Applicable Standard

As an initial matter, Defendants, citing to case law outside this District and largely outside this Circuit, argue that because the parties have already engaged in some discovery the Court should apply a more stringent, intermediate standard of review to Plaintiff's "similarly situated" burden. Despite this argument, courts in this District generally apply the "modest factual showing" standard to FLSA certification cases where the parties have engaged in some discovery but have not engaged in explicit and substantial class discovery.

In *Girolamo v. Cmty. Physical Therapy & Assocs., Ltd.*, No. 15 C 2361, 2016 WL 3693426, at *3 (N.D. Ill. July 12, 2016), for example, the defendants made an identical argument to that made by Defendants here—that the court should analyze conditional certification under the more stringent standards of the second step or at least receive intermediate scrutiny because

the plaintiff had the opportunity to conduct some discovery before filing the motion for conditional certification. The court rejected the defendants' argument, noting that in cases where courts applied intermediate scrutiny, the plaintiffs had already conducted discovery explicitly focused on the "similarly situated" issue and the defendants had provided a list of potential claimants to support that discovery effort. *Id.* In contrast, in *Girolamo*, the plaintiffs had only deposed the defendants' 30(b)(6) witness and one of their executives, and the defendants had only deposed one potential plaintiff. *Id.* Notably, defendants had not produced a list of potential claimants and the parties had not engaged in discovery with potential class members, so substantial discovery was still required. *Id.* As a result, the court refused to apply a heightened standard of review at the conditional certification stage of the case. *Id. See also Hudson v. Protech Sec. Grp., Inc.*, 237 F. Supp. 3d 797, 800 (N.D. Ill. 2017) (applying modest factual showing standard where parties conducted initial discovery); *Freeman v. Total Sec. Mgmt.- Wisconsin, LLC*, 2013 WL 4049542, at *4 (W.D. Wis. Aug. 9, 2013) (denying application of intermediate scrutiny because plaintiff had only conducted discovery consisting of "deposing two of defendants' corporate representatives and some of defendants' employee witnesses" and noting that court would apply more rigorous review at close of discovery).

Here, the parties' discovery thus far has primarily focused on jurisdictional and venue issues in large part because the Court initially limited discovery to jurisdictional issues pending the resolution of Defendants' motion to dismiss. (*See* R. 46, Order Staying Discovery; R. 82, Order Allowing Limited Jurisdictional Discovery.) Importantly, here, like in *Girolamo*, Defendants have not produced a list of potential claimants, and the parties have not yet engaged in discovery with the potential class members or in extensive discovery explicitly focused on the "similarly situated" issue. *See Babych v. Psychiatric Sols., Inc.*, No. 09 C 8000, 2011 WL

13

5507374, at *3 (N.D. Ill. Nov. 9, 2011) (rejecting intermediate standard because "inquiry at the conditional certification stage is necessarily limited by the lack of detailed information about the other opt-in plaintiffs, and application of the stringent standard might prevent some plaintiffs from pursuing their claims.")  This case thus stands in contrast to *Bunyan v. Spectrum Brands, Inc.*, 2008 WL 2959932, at *4 (S.D. Ill. July 31, 2008), the only case to which Defendants cited in this Circuit, where the court utilized a heightened review standard because it had expressly allowed "discovery on the issue of whether the plaintiffs are similarly situated" and the plaintiffs had been given access to a "list of other . . . potential members of the proposed class." Accordingly, like the *Girolamo* court and several other courts in this District,[5] here, since discovery is not complete and the parties have not engaged in targeted discovery on the conditional certification issue, the Court will apply the more lenient "modest factual showing" standard in assessing whether Plaintiffs have demonstrated that they and the other proposed claimants are similarly situated.

### B. Conditional Certification

Plaintiffs argue that they have made a modest factual showing that they and the other potential plaintiffs are similarly situated because they all work for Koch Foods through independent contracting companies, they all perform similar chicken-catching work—scheduled and planned by Koch employees—without receiving overtime pay, and all the contractors were subject to the identical service agreements whereby Koch paid the contractors per 1,000 chickens

---

[5] *See, e.g.*, *Sylvester v. Wintrust Fin. Corp.*, No. 12 C 01899, 2013 WL 5433593, at *3 (N.D. Ill. Sept. 30, 2013) (declining to use intermediate standard "given the conditional nature of this motion and the fact that the parties have not completed discovery"); *Betancourt v. Maxim Healthcare Servs., Inc.*, No. 10 C 4763, 2011 WL 1548964, at *13 (N.D. Ill. Apr. 21, 2011) (declining to apply intermediate standard because "extent of discovery in this case is insufficient"); *Molina v. First Line Solutions LLC*, 566 F. Supp. 2d 770, 786 (N.D. Ill. 2007) (declining to skip first step where parties did not yet have all the information that would be available to them once they knew who would opt in to the case).

caught and the contractors passed those payments on to the chicken-catchers. Defendants
counter that the Court should deny Plaintiffs' motion for conditional certification because (1)
Plaintiffs have not identified a common policy that violates the FLSA; (2) Plaintiffs and other
potential claimants were not similarly situated because they worked in different locations for
different third-party contractors and supervisors; and (3) procedural and fairness concerns dictate
that the Court should not grant certification. The Court addresses each of Defendants' arguments
in turn.

> **a. Common Policy or Practice**

Defendants first argue that Plaintiffs have failed to provide sufficient evidence that
Defendants have a common policy or practice that violates the FLSA. Specifically, Defendants
argue that Plaintiffs have failed to show that Defendants' use of third-party contractors was a
scheme to avoid FLSA liability and they have failed to show that the potential claimants were
subjected to a vertical reporting structure in which they were required to work unpaid overtime.
Despite Defendants' arguments, several courts in this District have conditionally certified a
collective action where multiple employees provided affidavits declaring that they consistently
worked overtime without being compensated, even if the plaintiffs did not identify a specific,
written policy requiring unpaid overtime work.

In *Anyere v. Wells Fargo, Co.*, No. 09 C 2769, 2010 WL 1542180, at *2 (N.D. Ill. Apr.
12, 2010), for example, the plaintiffs submitted five affidavits from potential claimants in which
they indicated that they all were credit managers who were required to log only 40 hours a week
and were not compensated for additional time worked before or after their shifts. The defendant
claimed that the plaintiffs' affidavits were insufficient evidence of a common policy or practice
extending beyond their individual supervisors. *Id.* The court explained that the plaintiffs were

not arguing that the defendant had an explicit, written policy to deny overtime pay, but rather that the defendant had an unwritten de facto policy of not paying overtime hours, which was sufficient to warrant conditional certification. *Id.* at *3. The court noted that the defendants' claim that the policy the plaintiffs were challenging was restricted to certain supervisors and locations was undercut by the plaintiffs' affidavits from multiple locations and regardless, was better addressed at the second stage of the certification process after the parties had engaged in more extensive discovery regarding the various locations. *Id.* Finally, the court explained that arguments related to the plaintiffs in fact "being . . . paid for all overtime worked go to the merits and [were] not appropriately considered at [the conditional certification] stage." *Id. See also Pieksma*, 2016 WL 7409909, at *5–6 (granting conditional certification where plaintiffs submitted declarations from employees at multiple locations with multiple supervisors indicating that they were not paid overtime despite working more than 40 hours per week); *Madden v. Corinthian Colleges, Inc.*, No. 08 C 6623, 2009 WL 4757269 (N.D. Ill. Dec. 8, 2009) ("Courts in this district regularly allow Plaintiffs to pursue collective actions under the FLSA where they allege that an employer has an unwritten policy requiring its employees to perform uncompensated work 'off the clock.'"); *Russell v. Illinois Bell Tel. Co.*, 575 F. Supp. 2d 930, 937–38 (N.D. Ill. 2008) (finding sufficient evidence of practice and policy violating the FLSA where employees testified that supervisors were aware that they were working overtime without compensation).

Similarly, courts have conditionally certified collectives against corporations, even if the corporation used staffing agencies or subsidiaries to hire and pay workers, where the plaintiffs provided evidence that the corporation had a policy or practice that caused workers to work unpaid overtime. In *Jackson v. Fed. Nat'l Mortg. Ass'n*, 181 F. Supp. 3d 1044, 1048 (N.D. Ga.

16

2016), for example, the plaintiffs sought conditional certification in an FLSA complaint against Fannie Mae, arguing that credit underwriters who worked for Fannie Mae at various locations worked unpaid overtime. Fannie Mae argued that plaintiffs had failed to show that Fannie Mae itself had a policy or practice that caused the underwriters to work unpaid overtime because independent staffing agencies directly employed the underwriters, and Fannie Mae argued those independent agencies were "solely responsible" for calculating and paying the underwriters' wages. *Id.* at 1059. The court rejected Fannie Mae's argument, finding that Fannie Mae managers directly supervised the underwriters' work, and that although Fannie Mae did not itself pay the underwriters, its policies and practices regarding production goals and payment dictated the staffing agencies' ability to pay the underwriters for overtime work. *Id.* at 1055. The court explained that, given Fannie Mae's oversight, the agencies' "calculation and payment of wages entailed little more than filling in the answer to a math equation that Fannie Mae wrote and provided all the relevant variables for." *Id.* at 1059. The court also noted that if there were differences in the individual agencies' handling of wage matters that, after discovery, were material to the core practice of not paying overtime, Fannie Mae could move for decertification at a later stage. *Id.* *See also Lima v. Int'l Catastrophe Sols., Inc.*, 493 F. Supp. 2d 793, 800 (E.D. La. 2007) (allowing conditional certification because employees who worked for various sub-contractors were similarly situated with respect to defendants' pay provisions).

Here, Plaintiffs have provided sufficient evidence, at this preliminary stage, to make a modest factual showing that Defendants had a common policy or practice that caused chicken-catchers at their various Complexes to work unpaid overtime. Like the plaintiffs in *Anyere* and *Pieksma*, Plaintiffs here have submitted multiple declarations from workers who worked at multiple locations in which they averred that they were regularly required to work more than 40

hours per week without being paid overtime. As the courts in those cases found, Plaintiffs need not identify a specific, written policy requiring them to work overtime. It is sufficient that they have provided multiple declarations indicating that Defendants had a de facto practice at more than one Complex of not paying for overtime hours.

Additionally, as in *Jackson*, here, while Defendants did not pay Plaintiffs directly, Plaintiffs have provided sufficient evidence that Defendants' policies and practices with regard to the chicken-harvesting schedules and locations, as well as their piece-rate payment scheme, dictated the third-party contractors' abilities to pay chicken-catchers for overtime work. Specifically, Plaintiffs have produced specific evidence that Defendants set the daily chicken catching schedules, determined when and how many chickens to put in each cage on each load, and employed Live Haul Supervisors who oversee the transportation of the chickens from the farm to the Defendants' processing plant. (Defs. Answer ¶¶ 113, 119, 126; Keyes Dep. 194: 11-21.) Plaintiffs' evidence thus stands in contrast to the "generalized" evidence rejected by the court in *Black v. P.F. Chang's China Bistro, Inc.*, No. 16-cv-3958, 2017 WL 2080408, at *10-11 (N.D. Ill. May 15, 2017)—the case upon which Defendants primarily rely. As the court stated in *Jackson*, here, Plaintiffs have provided sufficient evidence, at this early stage, to show that Defendants controlled the conditions under which the chicken-catchers worked and dictated the independent contractors' payments to the chicken-catchers, and as a result, the third-party contractors' "calculation and payment of wages entailed little more than filling in the answer to a math equation that [Defendants] wrote and provided all the relevant variables for." 181 F. Supp. 3d at 1059.[6]

---

[6] Although the court in *Jackson* substantively analyzed the plaintiffs' joint employer allegations, as discussed more fully below, the joint employer issue is a merits issues that the Court will refrain from substantively considering until after conditional certification and discovery. *See Watson v. Jimmy John's, LLC*, No. 15 C 6010, 2015 WL 8521293, at *3 (N.D. Ill. Nov. 30, 2015).

Defendants' arguments that Plaintiffs failed to show that Defendants decided to utilize independent contractors to intentionally subvert the FLSA and that Defendants' decision to pay the third-party contractors on a piece-rate basis was not a per se violation of the FLSA are both unavailing. First, Plaintiffs do not argue that Defendants' decision to pay on a piece-rate basis violates the FLSA. They argue, with the support of declarations from five employees and deposition testimony from Defendants' employees, that Defendants' implementation of this decision has caused the chicken-catchers to work unpaid overtime, which is a violation of the FLSA. Second, the Court need not at this stage determine whether Defendants used the independent contractors to avoid FLSA liability. At the conditional certification stage, it is sufficient that Plaintiffs have shown that Defendants and the independent contractors had a de facto policy and practice of not paying the chicken-catchers for overtime work. *See Madden*, WL 4757269 at *2. Whether Defendants engaged third-party contractors in an intentional scheme to subvert the FLSA is a merits issue not properly addressed at this stage of the certification analysis. *Bradford v. Logan's Roadhouse, Inc.*, 137 F. Supp. 3d 1064, 1076 (M.D. Tenn. 2015) ("[A] court should not weigh the merits of the underlying claims in determining whether potential opt-in plaintiffs may be similarly situated.") (citation omitted); *Nehmelman*, 822 F. Supp. 2d 745, 758 (N.D. Ill. 2011) (refusing to consider merits issue underlying plaintiffs' claims at conditional certification stage).

Accordingly, at this stage, Plaintiffs have provided sufficient evidence to make a modest factual showing that Defendants had a common policy or practice that violated the FLSA.

### b. Evidence That Putative Notice Recipients are Similarly Situated

Defendants also argue that Plaintiffs have provided insufficient evidence that they were similarly situated to the other potential plaintiffs because the other potential plaintiffs worked at

different Complexes for different independent contractors and had different supervisors. Courts regularly find, however, that a potential class is similarly situated for purposes of conditional certification, where, as here, the plaintiffs have provided multiple affidavits from workers from multiple locations demonstrating that they perform similar duties.

In *Jirak v. Abbott Labs., Inc.*, 566 F. Supp. 2d 845, 848–49 (N.D. Ill. 2008), for example, the court found that there was sufficient evidence that a collective of pharmaceutical representatives that the defendant employed throughout the country were similarly situated to warrant conditional certification of the class. The court reasoned that, despite minor variations in their job duties and supervisors, the pharmaceutical representatives had the same essential responsibility—calling on physicians and promoting the defendant's products. *Id.* at 848. The court emphasized that, to be similarly situated, the class members need not have identical positions with identical titles, functions, or pay, they just needed to perform the same general job. *Id.* at 849. *See also Pieksma*, No. 15 C 7312, 2016 WL 7409909, at *4 (N.D. Ill. Dec. 22, 2016) (finding that potential plaintiffs at nationwide offices were similarly situated at conditional certification stage because they had similar job functions and compensation structure); *Russell*, 575 F. Supp. 2d at 937–38 (finding potential plaintiffs were similarly situated where they provided affidavits indicating that they worked at different call centers with different supervisors but all had primary responsibility of receiving calls and selling defendant's equipment); *Perry v. Nat'l City Mtge., Inc.*, No. 05-891, 2007 WL 1810472, *3-4 (S.D. Ill. June 21, 2007) (conditionally certifying class of 5,500 loan originators despite defendant's argument that job duties varied depending on their classification, because loan originators had the same "overall mission").

20

Here, Plaintiffs have sufficiently demonstrated, at this preliminary certification stage, that the chicken-catchers at the various Complexes perform similar job functions and have similar duties such that they are similarly situated for purposes of the FLSA. Plaintiffs have provided affidavits from five individuals who worked at Koch Complexes in both Alabama and Mississippi as chicken-catchers. (Pl.'s Mot. for Conditional Certification, Ex.'s C-G.) In the affidavits, the individuals declared that they performed functionally the same work at each Complex—catching Koch chickens and loading them onto Koch cages for transport to Koch processing plants. (*Id.*) As a Koch representative testified, "[t]here is only one way to catch a chicken." (*Id.*, Ex. A, Keyes Dep. 156: 11; 165: 1-7.) Additionally, all the chicken-catchers work for third-party contractors that provide "similar functions" for Defendants and have similar service contracts with Defendants, whereby Defendants set the daily catch schedules and determine "when and how many chickens to put in each cage on each load." (Defs.' Answer ¶¶ 111, 119, 126.) These facts demonstrate, for purposes of conditional certification, that Plaintiffs have provided sufficient evidence to make a modest factual showing that the potential class members are similarly situated.

Defendants do not substantively dispute these facts, merely arguing broadly that the potential class members work under "widely disparate circumstances" and have different supervisors. (R. 145, Defs.' Resp. to Pls.' Mot. for Certification 8.) This argument is unavailing. First, similarly situated class members can have different supervisors and work at different locations as long as they have comparable work functions. *See, e.g.*, *Russell*, 575 F. Supp. 2d at 937–38 (N.D. Ill. 2008). Second, while here, Defendants provide no specific evidence to counter Plaintiffs' evidence of similarities between the potential class members' job functions, even if they had, courts typically delay consideration of "disparate factual and

employment settings of individual class members" until "the second stage of [certification] analysis." *Murton v. Measurecomp, LLC,* No. 1:07CV3127, 2008 WL 5725631, at *4 (N.D. Ohio June 9, 2008); *see also Waggoner v. U.S. Bancorp*, 110 F. Supp. 3d 759, 769–70 (N.D. Ohio 2015) (finding that defendant's arguments regarding disparate work conditions was "best left for consideration at the decertification stage").

Defendants also argue that the Court should not conditionally certify the proposed class because different third-party contractors employed different potential class members, and the Court cannot conduct the fact-intensive inquiry necessary to determine whether Defendants and the contractors are joint employers at the certification stage. Given the factual issues involved, however, the joint employer question is typically addressed at the decertification or summary judgment stage. *Watson v. Jimmy John's, LLC*, No. 15 C 6010, 2015 WL 8521293, at *3 (N.D. Ill. Nov. 30, 2015) (explaining that the joint-employer issue is a merits issue that is best addressed after conditional certification and class discovery to "shed light on whether the policies plaintiff challenges are mandated by [the franchisor or franchisees]."); *Reece v. United Home Care of N. Atlanta, Inc.*, No. 1:12–CV–2070–RWS, 2013 WL 895088, at *5 (N.D. Ga. Mar. 8, 2013) (citations omitted) (finding issues relating to liability as a joint employer "are properly reserved for dispositive motions or for the second stage of the class certification process"); *McKnight v. D. Houston, Inc.*, 756 F.Supp.2d 794, 806 (S.D. Tex. 2010) ("In instances where a motion for conditional certification involves a potential class of employees that worked for separate, but related, employers, courts have reserved consideration of whether the separate employers are joint employers for a final, stage two determination.").

In sum, Plaintiffs have preliminarily demonstrated that the chicken-catchers at Defendants' various complexes performed similar duties under the immediate direction of

22

similar independent contractors with Defendants' ultimate oversight. This showing establishes, at this stage, a colorable basis for their claim that a collective of similarly situated individuals exists.

### c. Procedural and Fairness Concerns

Defendants also argue, applying factors they concede are relevant only to the intermediate standard of review, that certifying the proposed class of plaintiffs would result in procedural unfairness and judicial inefficiencies because the class members as well as their supervisors worked at different locations in different states, and requiring them all to attend one trial in Chicago would be inefficient and costly. This argument is unavailing. First, as discussed above, the intermediate standard of review is not applicable here, and as such, Plaintiffs only need to make a moderate factual showing that the potential class members are similarly situated and do not need to show that certification will result in judicial efficiency and procedural fairness. *Camilotes v. Resurrection Health Care Corp.*, 286 F.R.D. 339, 345 (N.D. Ill. 2012) (noting that fairness and procedural concerns arise only at second stage of review). Second, even if these factors were relevant at this stage, they would favor conditional certification of the class. As discussed above, Plaintiffs have made the required moderate showing that the potential claimants in this case performed similar jobs and were subject to similar working conditions and Koch business practices, thus litigating their claims collectively is likely to produce judicial efficiencies. While their individual claims are small in dollar value, allowing them to pursue their FLSA claims as a class will ensure that they have the opportunity to assert their rights through litigation and if their claims have validity, it will ensure that Defendants are forced to take remedial action. *Babych*, 2011 WL 5507374, at *6 (noting the "remedial" purpose of the FLSA) (quoting *Tenn. Coal, Iron & R. Co. v. Muscoda Local No. 123*, 321 U.S. 590, 597 (1944).

### C.  Scope of Conditional Certification

Defendants seek to limit notice to chicken-catchers who worked at the Mississippi Complex arguing that no plaintiffs from other Complexes have opted in to this lawsuit and that Plaintiffs have failed to present evidence that the failure to pay chicken-catchers overtime wages was a company-wide practice.  Despite Defendants' arguments, several courts have found plaintiffs' evidence of a company-wide policy or practice, similar to Plaintiffs' evidence here, sufficient to warrant conditional certification of a class of employees at multiple locations.

In *Rangel v. Compliance Staffing Agency, LLC*, No. 3:16-CV-30 (CDL), 2016 WL 3769761, at *3 (M.D. Ga. July 12, 2016), for example, the court found that while only three plaintiffs at one location had consented to join an FLSA action, the plaintiffs had provided sufficient evidence, at the conditional certification stage, to show that the defendant had a widespread practice of not paying overtime such that a collective class including workers at several other locations was warranted.  The court explained that "[g]eographical differences do not necessarily doom a collective action, as long as the plaintiffs held similar positions and were subjected to similar treatment by the same decision-makers."  *Id.* at *2.  The court reasoned that "given the number of potential workers who may not have been fully compensated, some would likely seek to recover" compensation under the FLSA and they should "be given notice of their rights."  *Id.* at *3; *see also Girolamo*, 2016 WL 3693426, at *5 (finding sufficient evidence of widespread policy to warrant notice to employees at multiple facilities); *Jackson*, 181 F. Supp. 3d at 1059 (certifying class of employees who worked for multiple vendors because of evidence that they were similarly situated and subject defendant's common policy); *Russell*, 575 F. Supp. 2d at 937–38 (sending notice to multiple facilities because employees at each facility worked in similar positions, had similar duties, and were subject to similar policies); *Anyere*, 2010 WL

24

1542180, at *3 (finding sufficient factual nexus between employees at different locations to warrant conditional certification).

Although discovery related to the Complexes in states besides Mississippi and contractors besides JET has been limited, Plaintiffs have provided declarations from employees who worked at Defendants' Complexes in both Mississippi and Alabama, in which they averred that at both locations, they were not paid for overtime work. (R. 138, Exs. C-E.) Plaintiffs have also provided evidence that chicken-catchers at all Defendants' complexes performed the same duties, that Defendants paid contractors on a piece rate basis at all their Complexes, that Defendants set the catching schedules at the Complexes and oversaw Plaintiffs' work, and that all the various contractors worked under similar service contracts with Defendants. (Keyes Dep. 106: 22 – 107: 10, 108: 4-15, 120: 12-21, 108: 4-15; Berman Dep. 6: 10 – 7: 4; R. 138, Exs. L-V, Service Contracts.) Plaintiffs have also shown that although Defendants utilized multiple contractors, there is substantial overlap in the ownership of the independent contractors at the various Complexes and the contractors provide substantially similar services regardless of the Complex with whom they are contracting (Keyes Dep. 163: 24 – 164: 10; Omnibus Resp. Interrog. No. 1; Defs. Initial Disclosure 6, 13, 25.) Moreover, Plaintiffs recently submitted additional declarations from new Opt-In plaintiffs who worked at Defendants' Complexes in Alabama, Tennessee, and Georgia and who performed the same duties at Plaintiffs and were not paid for their overtime work. (*See e,g.*, R. 151, Ex. AI Arellanos Decl. ¶¶ 4-5, 10, 14-15; Ex. AJ F. Ortega Decl. ¶¶ 4-5, 10, 15.)

Here, like in *Rangel* and the other cases cited above, Plaintiffs have provided sufficient evidence, through affidavits from chicken-catchers at multiple complexes in multiple states, that Defendants had a widespread policy or practice of not paying chicken-catchers, who all

25

performed the same duties, for overtime work at their various Complexes. To the extent Defendants believe there are dissimilarities between the employees at the different Complexes and policies or practices for the different contractors, those arguments are "more appropriately decided at step two, after it is known who the class . . . will consist of, and after some of the factual issues can be fleshed out in discovery." *Jirak*, 566 F. Supp. 2d at 850 ("The mere potential that individual issues may predominate after further discovery does not preclude conditional certification of the class.")

Accordingly, Plaintiffs may send notice to potential claimants at all Defendants' Complexes.

## II.        Notice and Opt-In Consent Form

Plaintiffs argue that the Court should allow Plaintiffs to issue notice to Crew Members who worked at Koch facilities at any time three years prior to the filing of the FAC and have submitted a proposed notice form and opt-in consent form. Plaintiffs have also requested (1) a 90-day opt-in period; (2) that the notice be provided by mail and email and posted at each farm where potential claimants work; (3) that a duplicate copy of the notice be sent after 45 days; and (4) that the notice be translated into Spanish. Defendants take issue with Plaintiffs' proposed notice form and with Plaintiffs' requests. Defendants argue that Plaintiffs' notice form appears to come from the Court, unfairly favors Plaintiffs' version of the facts in this case, fails to make clear that potential claimants can opt out, and fails to state that there has been no final certification. Defendants also argue that a 90-day opt-in period is too long, that notice by email and by posting at the Complexes is unnecessary, that duplicate reminder notices are improper, and that they are entitled to receive any Spanish translations of the notice forms.

Given the disputes between the parties regarding Plaintiffs' proposed notice and in light of the Court's detailed Opinion, in the interest of judicial efficiency, the parties shall meet and confer regarding the content of the proposed notice. The parties shall file a joint proposed notice form.

## III.     Equitable Tolling

Plaintiffs also request that the Court equitably toll the running of statute of limitations as to the individuals who potentially will opt in to this case, but have not yet done so. Equitable tolling is a "rare remedy," which should be granted only when claimants have exercised due diligence in preserving their legal rights. *See Wallace v. Kato,* 549 U.S. 384, 396 (2007) (equitable tolling is "a rare remedy to be applied in unusual circumstances"); *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 96 (1990) ("Federal courts have typically extended equitable [tolling] relief only sparingly."); *Obriecht v. Foster*, 727 F.3d 744, 748 (7th Cir. 2013) ("Equitable tolling is an extraordinary remedy and so is rarely granted.") (internal quotation omitted). Equitable tolling is warranted only when the party has diligently pursued his or her rights and some extraordinary circumstance nevertheless prevented timely filing. *Id.* (citing *Holland v. Florida*, 560 U.S. 631, 649 (2010); *see also McQuiggin v. Perkins,* 133 S. Ct. 1924, 1931 (2013).

Here, Plaintiffs have failed to show that equitable tolling is warranted because they have failed to show that some extraordinary circumstance prevented the potential claimants from filing a lawsuit against Defendants. Plaintiffs appear to request[7] that the Court toll the running of the statute of limitations from the date they filed their motion for conditional certification, June 20, 2017, or from the date the parties completed briefing, August 21, 2017, to the date the Court

---

[7] In their motion and briefing, Plaintiffs do not explicitly request equitable tolling, but the parties argue the issue as if they had, so the Court has ruled on the equitable tolling issue for the sake of clarity.

ruled upon the motion, September 18, 2017—a period of less than three months or if from the completion of briefing, a period of less than a month. Simply put, it is not extraordinary for a court to take less than a month to address a fully briefed motion for conditional certification and for the plaintiffs to delay notice while that motion is pending. *See Sylvester v. Wintrust Fin. Corp.*, No. 12 C 01899, 2014 WL 10416989, at *2–4 (N.D. Ill. Sept. 26, 2014) (denying equitable tolling and explaining that "*some* period of time must be considered normal, rather than extraordinary, for a court to address a conditional certification motion"); *Garrison v. Conagra Foods Packaged Food, LLC,* 2013 WL 1247649, at *5 (E.D. Ark. Mar. 27, 2013) ("there is nothing extraordinary about a motion for conditional certification and the delay in notice while that motion is pending"). Here, Plaintiffs have not identified any extraordinary circumstance delaying timely filing. *Compare, e.g.*, *Bergman,* 949 F. Supp. 2d at 860 (delay of 2 years held to be extraordinary) *with Sylvester*, WL 10416989, at *2–4 (delay of 6 months not extraordinary); *Bitner v. Wyndham Vacation Resorts, Inc.*, 301 F.R.D. 354, 363 (W.D. Wis. 2014) (delay of 7 months not extraordinary); *Greenstein v. Meredith Corp.,* 2013 WL 4028732, at *1–2 (D. Kan. Aug. 7, 2013) (11–month delay not extraordinary); *Young v. Dollar Tree Stores, Inc.,* 2013 WL 1223613 (D. Colo. Mar. 25, 2013) (10–month delay; tolling not warranted).

　　　Additionally, even if Plaintiffs had shown that the delay here was extraordinary, they have also failed to establish that potential opt-in plaintiffs were prevented from joining the lawsuit by that delay. As the court explained in *Sylvester*, "[n]o ruling by this Court was necessary to permit the filing of another law suit or an opt-in notice in this suit; nothing prevented any former employee of the defendants from either filing their own law suit or filing an opt-in notice for this law suit before a ruling on the conditional certification motion was issued." WL 10416989, at *3. Here, Plaintiffs have not shown how the minimal delay prevented

any potential opt-in claimants from diligently asserting their rights, and thus, they have not shown that equitable tolling is warranted. *See Sylvester*, WL 10416989, at *3-4 (denying equitable tolling because plaintiffs failed to show how the "absence of a conditional certification ruling prevented other potential plaintiffs from asserting their rights"); *Bitner,* WL 3698850, at *10 (delay in ruling did not prevent others from timely joining the law suit); *Greenstein*, WL 4028732, at *2 (rejecting equitable tolling, in part because the "opt-in plaintiffs have had the same notice of their rights and obligations available to them as did the named plaintiff in this case").

Accordingly, Plaintiffs' motion for equitable tolling of the statute of limitations based on the delay necessary to rule on the conditional certification motion is denied.

## CONCLUSION

For the foregoing reasons, the Court Plaintiffs' motion for conditional certification and to facilitate notice.

**Dated:** September 18, 2017

AMY J. ST. EVE
United States District Court Judge